**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**DEQUE SYSTEMS INC.,**

      **Plaintiff,**                              **Case No. 1:24-cv-00217-AJT-WEF**

**v.**

**BROWSERSTACK, INC., et al.,**

      **Defendants.**

---

*** ██ REDACTED ██ ***

**PLAINTIFF DEQUE SYSTEMS INC.'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

This Court should deny Defendants BrowserStack, Inc. ("BrowserStack US") and BrowserStack Software Pvt. Ltd.'s ("BrowserStack India") (collectively, "BrowserStack") motion for summary judgment ("MSJ") [Dkt. 138]. BrowserStack's CEO and other employees admitted copying and reverse engineering Plaintiff Deque Systems Inc.'s ("Deque") software code. BrowserStack's MSJ does nothing to refute this evidence and instead stretches in search of a technical loophole—which does not exist—to try to prevent Deque from presenting its claim for damages to the jury.  In so doing, BrowserStack misstates both the facts and the law, and asks the Court to take the extreme measure of ruling that BrowserStack's numerous misdeeds amount to "no harm, no foul." BrowserStack's MSJ should be denied and summary judgment should instead be granted in favor of Deque as to liability so that the specific quantification of Deque's damages can be properly determined by the jury.

## II.  ANSWER TO BROWSERSTACK'S STATEMENT OF UNDISPUTED FACTS

Deque generally objects to BrowserStack's statement of undisputed facts ("SUF"), which

consistently misstates facts, attempts to disguise argument as fact, and relies on erroneous legal conclusions.

1–5.    Deque admits Paragraphs 1 through 5 of BrowserStack's SUF.

6.    Deque admits that it filed this lawsuit on February 13, 2024, and that the First Amended Complaint ("FAC") asserts five causes of action. Deque denies the remainder of Paragraph 6 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. The scope of Deque's claims and allegations in the FAC are not limited to axe DevTools® ("DevTools"). Indeed, the FAC expressly alleges BrowserStack copied Deque's Rules Help Pages and Doc-Issue-Help pages. *See* Dkt. 44-1, ¶¶ 24, 36, 38, 44, 47–49, 56, 105, & Ex. E.

7.    Deque admits Paragraph 7 of BrowserStack's SUF.

8.    Deque admits that it alleges BrowserStack infringed two types of works, DevTools and the Rules Help Pages. Deque admits that the FAC identifies BrowserStack's Accessibility Testing Toolkit ("ATT") as an infringing work, and an infringing version of ATT was released in or around May or June 2023. Deque denies the remainder of Paragraph 8 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. Deque alleged BrowserStack sold ATT within the Chrome Webstore, which resulted in the sale and distribution of infringing works in and throughout the United States. *See* Dkt. 44-1, ¶¶ 40–42. As explained *infra*, BrowserStack India's conduct is actionable under U.S. copyright law.

9.    Deque denies Paragraph 9 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. In the FAC, Deque asserts 17 copyright registrations. *See* Dkt. 44-1, ¶¶ 37–38. Sixteen of Deque's registrations are different versions of DevTools, and the remaining works relate to the Rules Help Pages. *See id.* As statutory damages are not at issue, discussions about minutia (immaterial differences between various software updates) are

irrelevant.

10.    Deque denies Paragraph 10 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. Deque produced five (5) pages of charts comparing asserted and accused works (highlighting similarities in red). Dkt. 141-3, PageID# 1454–59 (Ex. A to Deque's interrogatory answers). As explained *infra*, plaintiffs in copyright infringement actions are not required to provide a filtration analysis in this context. Additionally, expert witness testimony is not required when, as is the case here, the copied material is in plain English.

11.    Deque admits BrowserStack copied material that, in the abstract, is related to public accessibility standards. Deque denies the remainder of Paragraph 11 of BrowserStack's SUF as it contains factual and legal mischaracterizations. Thus, it is untrue. Whether or not an asserted work generally relates to, in the abstract, factual matter or other works does not affect its copyrightability.

12.    Deque admits Paragraph 12 of BrowserStack's SUF.

13.    Deque admits Melanie Phillips ("Phillips") was not named, in response to an interrogatory answer, in the list of over 100 employees who worked on the asserted works. Deque denies the remainder of Paragraph 13 of BrowserStack's SUF as it contains factual and legal mischaracterizations and is thus untrue. Phillips (and her role) was discussed at length during discovery. *See, e.g.*, Dkt. 145-4, 35:9–42:5. Simply, BrowserStack did not suffer any prejudice.

14.    Deque denies Paragraph 14 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. Apurv Jain ("Jain") committed infringing acts and has a unique interest in claiming that infringement has ceased. *See generally* Dkt. 147 (detailing Jain's misconduct, with supporting documents).

15.    Deque denies Paragraph 15 of BrowserStack's SUF as it relies on factual and legal

mischaracterizations. Thus, it is untrue. As explained *infra*, plaintiffs in copyright infringement actions are not required to provide a filtration analysis in this context, and an expert is not required to establish similarities between two texts presented in plain English. Further, Deque obtained sufficient information regarding ATT's code through independent investigation. *See* Dkt. 150-3, ¶ 17. Based on its investigation, for example, Deque created a code comparison table. *See* Dkt. 147-8. BrowserStack also produced a requirements document for ATT's assisted testing rules engine ("Requirements")—comprised primarily of Deque's copyrighted materials. *See* Dkt. 150-1 (Requirements); Dkt. 150-6 (comparison table); Dkt. 150-7 (same).

16.    Deque denies Paragraph 16 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. Deque acknowledges that "software developers" are one category of "target consumers." As explained *infra*, however, plaintiffs in copyright infringement actions are not required to establish that an intended audience generally finds that two works are similar in circumstances, as is the case here, where copying was verbatim. Nevertheless, Deque produced evidence of copying and similarity, including five (5) pages of charts showing as much. *See* Dkt. 141-3 PageID 1454–59 (Ex. A to Deque's Interrogatory Answers).

17.    Deque admits that the FAC alleges false advertising under federal and Virginal law with regard to the statements identified in Paragraph 17 of BrowserStack's SUF. However, Deque notes, it is no longer asserting false advertising based on "de-duplication of issues" or screen reader integration.

18.    As to Paragraph 18 of BrowserStack's SUF, Deque admits BrowserStack removed the representative example identified in the FAC from BrowserStack's website. However, BrowserStack still falsely advertises that its ATT is "5x Faster" (without specifically naming Deque) on the Chrome Webstore. Ex. 4, Chrome Webstore.

19.     Deque denies Paragraph 19 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. As explained in Deque's affirmative motion for summary judgment, Deque's false advertising claims are supported by substantial evidence, including deposition testimony from both parties. *See infra*; *see also, e.g.*, Dkt. 147, PageID# 1738–41.

20.     Deque denies Paragraph 20 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. For example, BrowserStack's speed "calculations" were manufactured by Jain, ███████████████████████████████████████

████████████████  *See* Dkt. 150-5, PageID# 2032–33. Rather, Jain ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████  *See id.*

21.     Deque denies Paragraph 21 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. BrowserStack cites the deposition of Harris Schneiderman ("Schneiderman") for the proposition that "Deque testified it is not aware if any of the statements were false." This is untrue. As BrowserStack's counsel's declaration acknowledges, Schneiderman's list of deposition topics *did not include* the topic of false advertising. Dkt. 141, ¶ 15. Notably, during the cited testimony, Deque's counsel objected to questions regarding false advertising as being outside the scope of Schneiderman's 30(b)(6) deposition. Dkt. 145-4, PageID# 1655. BrowserStack also selectively omitted material portions of Schneiderman's testimony. The testimony, in full context (attached), makes clear that Schneiderman lacked personal knowledge of the "5x faster" false adverting claim (noting, however, that others at Deque could provide insight). Ex. 2, Schneiderman Dep. Excerpt. And indeed, Dylan Barrell ("Barrell") testified that

Deque products contain report consolidation capabilities, a central reporting dashboard, and multipage scanning capability. Dkt. 147-11, PageID# 1849–50.

22.      Deque denies Paragraph 22 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. Jain committed wrongful acts and has a unique interest in claiming ignorance. *See generally* Dkt. 147 (detailing Jain's misconduct, with supporting documents). Further, BrowserStack has not explained why, even if true, this would be relevant to liability. To the extent a guilty employee, Jain, does not remember the features of the software he copied, then other *contemporaneous* documented evidence fills such gaps in memory.

23.      Deque denies Paragraph 23 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. BrowserStack asked Neel Sinha ("Sinha") if he knew if any Deque customers saw a specific false advertisement and Mr. Sinha testified he had no personal knowledge of any customer seeing the specific ad. Dkt. 145-5, 90:11–92:25. Similarly, while Sinha could not attach a specific number to lost revenue (a common feature of false advertising claims), he could point to ways in which BrowserStack's competition in the market (which includes advertising) negatively affected Deque, by, for example, creating a sudden and immediate pricing pressure. *See id.*

24.      Deque denies Paragraph 24 of BrowserStack's SUF. BrowserStack is misstating Deque's claim of breach of contract. DevTools has a paid license ("Pro License") and a free license ("Free License"). Both the Pro License and Free License contain the following express prohibition which BrowserStack breached: BrowserStack "may not, and may not allow any third party to . . . [1] [d]ecompile, disassemble, decrypt, or reverse engineer the Product or attempt to derive the source code for any part of the Product;" or (2) "Modify or create derivative works of the Product." The Licenses also contain a catchall that states users cannot "[o]therwise use or copy the Product

except as expressly provided [herein]." Dkt. 147-23, Pro License, PageID# 1910–11; Dkt. 147-22, Free License, PageID# 1901. Deque explained its breach theory in its response to BrowserStack's second set of interrogatories, Dkt. 141-5 PageID# 1472, and the FAC, Dkt. 44-1, ¶ 34. Deque also alleged a breach of its website's terms of use ("ToU"). Dkt. 44-1, ¶¶ 78–85.

25.    Deque partially admits Paragraph 25 of BrowserStack's SUF in so much as creating a derivative work is one part of Deque's breach of contract claim. However, as stated in Paragraph 24 *supra*, Deque has long asserted multiple other grounds for breach. Deque also states that it is no longer pursuing a theory that involves BrowserStack publishing benchmark tests as, after the FAC was filed, BrowserStack admitted its "5x faster" claim: was not based on actual testing. *See* Dkt. 147 and accompanying evidence, PageID# 1738–42.

26.    Deque denies Paragraph 26 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. For example, a BrowserStack agent named Peter Muller-Earl ("Muller-Earl"), based in the U.S., activated a free trial of DevTools using a "browserstack.com" email address. Dkt. 147-20, PageID# 1879 (listed 8th). Both the Pro and Free Licenses require users to agree that they have the authority to bind their respective organization. Dkt. 147-23, PageID# 1910; Dkt. 147-22, PageID# 1900.

27.    Deque admits Paragraph 27 of BrowserStack's SUF.

28.    Deque admits Paragraph 28 of BrowserStack's SUF.

29.    Deque admits Paragraph 29 of BrowserStack's SUF.

30.    Deque denies Paragraph 30 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. To the extent there are any deficiencies in Deque's disclosures, it is a direct result of BrowserStack's improper withholding of evidence. *See* Ex. 6, Rule 56(d) Decl. Additionally, out of an abundance of caution, Deque has updated its Rule 26(a)(1)

initial disclosures, attached hereto as Exhibit 7.

31.     Deque denies Paragraph 31 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. To the extent there are any deficiencies in Deque's disclosures, it is a direct result of BrowserStack's improper withholding of evidence. *See* Ex. 6, Rule 56(d) Decl.

32.     Deque denies Paragraph 32 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. Deque timely served a rebuttal damages expert report. *See* Ex. 8. Additionally, to the extent there are any deficiencies or delays in disclosures, it is a direct result of BrowserStack's improper withholding of evidence. *See* Ex. 6, Rule 56(d) Decl.

33.     Deque denies Paragraph 33 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. Additionally, to the extent there are any deficiencies or delays in disclosures, it is a direct result of BrowserStack's improper withholding of evidence. *See* Ex. 6, Rule 56(d) Decl.

34.     Deque denies Paragraph 34 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. To the extent there are any deficiencies in Deque's disclosures, it is a direct result of BrowserStack's improper withholding of evidence. *See* Ex. 6, Rule 56(d) Decl. Additionally, out of an abundance of caution, Deque has updated its initial disclosures, attached hereto as Exhibit 7.

35.     Deque denies Paragraph 35 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. BrowserStack failed to produce relevant evidence in discovery,  , *see* Dkt. 72, Ex. 6, Rule 56(d) Decl., and Deque clearly identified injuries incurred as a result of BrowserStack's unlawful copying. For example, Deque produced evidence of contracts that were renegotiated as a result of BrowserStack's rapid entry into the market, which was only

made possible by copying. *See* Dkt. 150-3, ¶¶ 20–21; Dkt. 150-11 (revised quote for a large account). Additionally, Deque is not required to identify lost customers to prevail on its false advertisement claim.

36.    Deque denies Paragraph 36 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. BrowserStack is misstating testimony. BrowserStack asked Sinha (Deque's VP of Sales) a series of questions about how much revenue is attributable to each specific version of DevTools. Dkt. 145-5, PageID# 1689–93. Deque does not sell DevTools' individual versions. It sells a subscription that allows users to access the most recent version which means data regarding how much each version made is not collected. This is why Sinha testified he can share revenue data from specific timeframes but not specific versions. *Id.* at PageID# 1692-93. BrowserStack sells their ATT in the same way. Notably, they do not track revenue by version either. *See* Exhibit 3, BrowserStack Financial Data. BrowserStack also does not articulate why revenue data for each version would be material since Deque has produced subscription revenue data. Finally, as stated in Paragraph 35 *supra*, Deque can point to specific losses from BrowserStack's entry into the market.

37.    Deque denies Paragraph 37 of BrowserStack's SUF as it relies on factual and legal mischaracterizations. Thus, it is untrue. Deque is not required to show lost sales to prevail on a false advertisement claim as harm is presumed in cases of comparative advertising.

### III.    ARGUMENT

### A.    BrowserStack Is Liable for Breach of Contract

BrowserStack argues that Deque cannot establish that BrowserStack US entered into the applicable agreements or that there was a breach thereof. *See* Dkt. 145, PageID# 1548. Both contentions are incorrect.

### i.    BrowserStack US entered into the applicable agreements

As a threshold matter, BrowserStack failed to even cite the Virginia statute that governs the contracts at issue. *See* Va. Code Ann. § 59.1-501.3(a). Thus, BrowserStack failed to establish it is legally entitled to summary judgment on the existence of a valid and enforceable contract. The relevant statute is the Uniform Computer Information Transactions Act found at Va. Code Ann. § 59.1-501.1, *et seq.* Pursuant to Section 59.1-501.12, a party manifests their assent to a contract involving a computer information transaction when they have "an opportunity to review" the contract and the party "authenticates the [contract] with intent to adopt or accept it" or "engages in conduct" from which the other party may infer assent. "Authentication may be proven in any manner, including a showing that a party made use of information or access that could have been available only if it engaged in conduct or operations that authenticated the [contract]." Va. Code Ann. § 59.1-501.8. Importantly, the Free and Pro Licenses both expressly provide that an agent or employee of an organization represents that by agreeing to either license they have the authority to bind their organization. Dkt. 147-23, PageID# 1910; Dkt. 147-22 PageID# 1900. Thus, Deque only needs to show a BrowserStack US employee or agent made use of or accessed information only available after the Free License, Pro License, and/or Terms of Use ("ToU") were accepted. Here, this fact is not genuinely disputed.

The list of BrowserStack employees with a DevTools account includes Muller-Earl. Dkt. 147-20, PageID# 1879 (8th account listed). Muller-Earl's account information reveals he created an account for a trial version of DevTools. Ex. 1, Barrell Decl. Muller-Earl created this account in New Braunfels, Texas using an @browserstack.com email address. *See id.* BrowserStack US is located in Texas. *See* Ex.4, Chrome Webstore; Dkt. 51, ¶ 3. As he was using a BrowserStack domain name, Muller-Earl acted as an agent of BrowserStack US. When a user creates an account for a trial version of axe DevTools, they are presented with an opportunity to review and are

required to accept the terms of the Free or Paid Licenses. Ex. 1, Barrell Decl. It is impossible to access the trial version of DevTools without agreeing to the Free License.[1] *Id.* This demonstrates BrowserStack US entered into a contract with Deque or, at the very least, creates a genuine issue of material fact regarding the existence of a contract.[2]

### ii.    BrowserStack breached the applicable agreements

In an attempt to deny the existence of a breach, BrowserStack flagrantly misconstrues the applicable agreements and ignores relevant theories. First, BrowserStack's MSJ wholesale fails to analyze Deque's theory of breach based on the ToU. *See* Dkt. 44-1, FAC, ¶ 78-85. Thus summary judgment must be denied at least to this theory.

Second, contrary to BrowserStack's false aversions, Deque's contract claim is not limited to the publishing of benchmark tests (a theory that has been withdrawn). *See* Dkt. 145, PageID# 1548. Rather, the contracts contain several other applicable provisions.  Both the DevTools Pro License and the Free License contain the following express prohibition: "[BrowserStack] may not, and may not allow any third party to . . . [1] [d]ecompile, disassemble, decrypt, or reverse engineer the Product or attempt to derive the source code for any part of the Product;" or (2) "Modify or create derivative works of the Product." The agreements also contain a catchall that states users cannot "[o]therwise use or copy the Product except as expressly provided [herein]." Dkt. 147-23, PageID# 1910-11 (Pro License); Dkt. 147-22 PageID# 1901 (Free License). Deque specifically notified BrowserStack that it was relying on these provisions in its response to BrowserStack's second set of interrogatories, Dkt. 141-5, PageID# 1472) and the FAC, Dkt. 44-1, ¶ 34.

---

[1] It does not matter whether BrowserStack US is bound by the Free License or the Pro License because the provisions BrowserStack breached are identical in both contracts.

[2] Moreover, even if BrowserStack were somehow successful on the contract claim as to BrowserStack US, Deque's claim against it for unjust enrichment would remain.

Third, even if BrowserStack addressed all of the relevant grounds for breach, it could not prove it did not breach because BrowserStack admitted to reverse engineering. The phrase "reverse engineering" is a common contractual term and is unambiguous. *See SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 381–82 (4th Cir. 2017). The Fourth Circuit in *SAS* analyzed a prohibition nearly identical to the prohibitions found in the Free and Paid Licenses and held that the plain meaning of the term "reverse engineer" covered "any attempt to analyze a product to learn the details of its design, construction, or production *in order to produce a copy or improved version.*" *Id.* (internal citations omitted) (emphasis added).

BrowserStack admitted to analyzing DevTools to learn the details of its design and produce a copy or improved version. Indeed, Jain . Dkt. 150-5, PageID# 2025. BrowserStack's DevTools usage data shows spikes in usage during the development cycle for the ATT. *See* Dkt. 150-13. Finally,

. *See* Dkt. 150-2.

*Id.* at PageID# 1988.

## B.  BrowserStack Misstates Copyright Law and Improperly Attempts to Shift Its Own Burdens to Deque

BrowserStack's arguments rely on misstatements of governing copyright law. For context, BrowserStack built its ATT assisted test feature by directly copying, *verbatim*, Deque's plain English instructional text (Rule IDs, Issue Descriptions, and How to Fix text) found in axe DevTools and Deque's Rules Help Pages. *See* Dkt. 147-8, PageID# 1815 (showing issue description text and Rule IDs in the javascript file vendorbundle.js); Dkt. 147-4 (Rules Help

Pages). Deque's theory of liability does not rely on BrowserStack copying program logic or algorithms from Deque's code. Thus, understanding BrowserStack's copying requires no technical understanding of computer code; only the ability to compare two sets of plain English text from each program. As explained below, this renders inapposite much of the case law cited by BrowserStack in its MSJ.

### i. BrowserStack misconstrues the substantial similarity analysis

BrowserStack does not make any argument concerning copying in fact. Rather it focuses on legal copying, also known as "substantial similarity." The substantial similarity inquiry breaks down into a two-prong test with the first prong being an extrinsic test and the second prong being an intrinsic test. *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 435 (4th Cir. 2010). However, as is the case here, where copying "is literal or verbatim, then clearly substantial similarity results;" in other words, "exact copying subsumes substantial copying, so the broth already includes the necessary proof." 4 Nimmer on Copyright § 13.03 (2024). It is a logical impossibility for verbatim copying to not result in substantial similarity. As the court in *Silver Ring Splint Co. v. Digisplint, Inc.*, 543 F. Supp. 2d 509 (W.D. Va. 2008) explains:

> The extrinsic and intrinsic prongs of the substantial similarity analysis consider the substantial similarity of the works' ideas and expression of those ideas, respectively. With the sort of verbatim or 'literal' similarity presented here, however, *it is not necessary to determine the level of abstraction at which similarity ceases to consist of an 'expression of ideas,' because literal similarity by definition is always a similarity as to the expression of ideas*.

*Id.* at 517 (internal quotations and citations omitted) (emphasis added). It is clear that in instances of verbatim copying, substantial similarity necessarily results.

### ii. BrowserStack, not Deque, is required to conduct a filtration analysis

According to BrowserStack, Deque was required to present an analytical dissection of its

works that filter out any unprotected elements.[3] *See* Dkt. 145, PageID# 1539. This is not how analytical dissection works. Analytical dissection is a process that requires interpreting doctrines of copyright law (e.g., the merger doctrine, scènes à faire, etc.) which means it necessarily occurs in front of a judge who can make rulings on questions of law. *See* 4 Nimmer on Copyright § 13.03(B)(2) (detailing various legal doctrines for filtering out unprotected elements). The proper order of operations for a copyright infringement claim at summary judgment is as follows:

> Once the plaintiff has proven that he has a valid copyright and that the defendant engaged in factual copying, the defendant may seek to prove that some or all of the copied material is unprotectable. If the defendant carries this burden as to any portion of the copied material, that material should be filtered out of the analysis before comparing the two works. After filtration is complete, the burden shifts back to the plaintiff to prove substantial similarity between any remaining (i.e., unfiltered) protectable material and the allegedly infringing work. If the defendant demonstrates—at the filtration stage—that it copied only unprotectable material, such that no substantial similarities remain after filtration, the defendant is entitled to summary judgment.

*Compulife Software, Inc. v. Newman*, 959 F.3d 1288, 1306 (11th Cir. 2020); *see also Ganz Bros. Toys v. Midwest Imps.*, 834 F. Supp. 896, 902 (E.D. Va. 1993) ("To win summary judgment, [defendant] must establish either that no reasonable jury could find that the works were substantially similar or that any similarities between the works are attributable to noncopyrightable elements."). Deque has identified specific, objective similarities in the FAC, Dkt. 44-1, ¶¶42–44, its interrogatories, Dkt. 141-3 PageID# 1454–59, and Deque's affirmative motion for summary judgment, Dkt. 147-6, 147-7, 147-8. It is thus BrowserStack's burden to prove these similarities are only in the works' unprotected elements.[4]

---

[3] The "extrinsic inquiry is an objective one, looking to specific and external criteria of substantial similarity between the original elements (and only the original elements) of a protected work and an alleged copy." *Copeland v. Bieber*, 789 F.3d 484, 489 (4th Cir. 2015) (internal quotations omitted). The extrinsic inquiry involves filtering or analytically dissecting works. *See id.*

[4] An example of a plaintiff failing at the extrinsic stage can be found in *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532 (4th Cir. 2015). There, *after the defendant*

BrowserStack has not contested Deque's ownership of a valid copyright, nor has it contested copying in fact.[5] Thus, to establish entitlement to summary judgment on extrinsic similarity (or dissimilarity), BrowserStack must show "it copied only unprotectable material, such that no substantial similarities remain after filtration." *Compulife*, 959 F.3d 1306.

### iii.    BrowserStack's filtering arguments are legally unsupported

BrowserStack's filtering arguments lack merit and fail to even define what constitutes protectable expression. Copyright protection extends "only to those components of a work that are original to the author." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991). In other words, copyright only protects an author's original expression. Expression is original where it is "independently created by the author" and "possesses at least some minimal degree of creativity." *Id.* at 345. The threshold for creativity is "extremely low" such that "even a slight amount will suffice." *Id.* None of BrowserStack's arguments demonstrate that any part of DevTools or the Rules Help Pages fall outside of the bounds of original expression.

BrowserStack also complains that Deque did not identify Phillips, a single employee, in its disclosures. BrowserStack then makes the erroneous logical leap to conclude this means Deque "did not consider the material she authored to be copyrightable content." This nonsense supposedly provides grounds to filter out Phillips' contributions to the Rules Help Pages.[6] BrowserStack has provided no supporting citations to explain how this means that Deque's expression is unoriginal or otherwise unprotected. That is because this argument has no basis in law.

---

*demonstrated a lack of similarity in the protected elements of each work,* the plaintiff lost because they could produce no evidence to rebut the defendant's showing. *Id.* at 541.

[5] Note, there is evidence of Deque's ownership of a valid copyright and copying in fact. This is explained in detail in Dkt. 147, PageID# 1731.

[6] Importantly, Deque's corporate representative corrected this omission in his deposition where Phillips' contributions were discussed in detail. Dkt. 145-4, PageID# 1644.

BrowserStack also contends that "Deque admitted that the allegedly copied content relates to public computer accessibility standards, such as 'the web content authoring guidelines, abbreviated as WCAG and ARIA, Accessible Rich Internet Applications.'" BrowserStack does not articulate why this fact is relevant. It is not. Deque presumes Browserstack is suggesting this fact means (1) Deque's works were not original, and/or (2) Deque's works are factual and therefore uncopyrightable. These arguments are easily dispelled as "[o]riginality does not signify novelty." *Feist*, 499 U.S. at 345. Indeed, most nonfiction works discuss topics and ideas covered in other works, but that does not make such descriptions (or expressions) unoriginal or unprotectable. And, while it is true that copyright law does not accord ownership in facts, the way a work expresses facts is protectable. *Brammer v. Violent Hues Prods*., LLC, 922 F.3d 255, 266–67 (4th Cir. 2019) ("The ultimate task is to separate the 'facts or ideas set forth in a work,' which are not protected, from the 'author's manner of expressing those facts and ideas,' which is protected."). In so much as the Rules Help Pages are expressing "facts" contained within WCAG or ARIA, the way they discuss those standards is original and protectable.

Another of BrowserStack's filtering arguments relates to Deque's interrogatory answers and an alleged failure to establish extrinsic similarity. *See* Dkt. 145, PageID# 1539. First, as explained above, Deque does not bear the burden of conducting a filtration analysis. Second, Deque presents evidence other than its interrogatory answers to establish liability. *See, e.g.*, Dkt. 147, PageID# 1732–38. Nevertheless, BrowserStack misconstrues Deque's interrogatory answers. BrowserStack complains about the sufficiency of a chart attached as Exhibit A to Deque's interrogatory answers. Dkt. 145, PageID# 1539. BrowserStack is, however, cherry picking a single chart and ignoring the other charts in 5 pages of comparisons. Dkt. 141-3 PageID# 1454–59 (Exhibit A to Deque's interrogatory responses). These charts were prepared with the code Deque

engineers obtained from the ATT. Dkt. 150-3, ¶ 17. Additionally, the interrogatory to which this cherry-picked chart was attached asked Deque to identify "all Allegedly Copied Content"—*it did not ask Deque to identify all content it believes constitute protected expression.*

BrowserStack next argues that all of the copied material is dictated by efficiency constraints which require expert analysis. Again, as already explained, Deque does not bear the burden of filtering. Additionally, no expert is needed because this case requires comparing plain English instructional text and "the trier of fact does not need an expert to compare two literary works that are expressed in simple English." *Kindergartners Count, Inc. v. Demoulin*, 249 F. Supp. 2d 1214, 1232 (D. Kan. 2003). Finally, an efficiency constraints argument requires showing that there are only one or two ways of expressing an idea because all other ways of expressing would cause "substantial" efficiency tradeoffs. 4 Nimmer on Copyright § 13.03(F)(2)(b). BrowserStack has made no such showing. Moreover, these efficiency arguments fail where there is evidence that a defendant produced a modified version of the infringing work with alternative expression. *Id.* at n. 304.2; *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 534 (5th Cir. 1994) (noting the defendant "inadvertently conceded that the questions and processes that comprise the [work] can be written in several ways when it undertook to create a modified [work] that was devoid of infringing language"). In this case, instead of copying them verbatim, BrowserStack wrote some of the "How to Fix" text for the assisted tests without copying language from Deque's Rules Help Pages. Dkt. 150-2 (cells K5-K7) (unlike the cells cited in the How to Fix Table, these cells contain no text from the Deque links found in Column L). And, according to BrowserStack's own proposed expert, ████████████████████████████████████████████

████████████████████████████████████████████████████████

Dkt. 150-12, ¶¶ 51–56. This dispenses with any notion that their verbatim copying was due to

efficiency constraints.[7]

### iv. BrowserStack's intrinsic similarity arguments fail

The intrinsic prong considers all elements, protected or not, and asks whether the works have a similar "concept and feel." *Universal Furniture*, 618 F.3d at 436. During this stage, BrowserStack must identify differences in the concepts and feel of the work. BrowserStack does not articulate a single dissimilarity in the works' overall concept and feel. Instead, BrowserStack's intrinsic similarity arguments rely entirely on claiming that Deque cannot present evidence of intrinsic similarity. This argument falls short for several reasons.

Deque has provided copious evidence demonstrating ATT contains verbatim copying. *See, e.g.*, Dkt. 141-3 PageID# 1454–59 (Ex. A to Deque's interrogatory answers; Dkt. 147-6 (How To Fix Table); Dkt. 147-7 (Issue Description Table); Dkt. 147-8 (Code Comparison Table). And, verbatim copying necessarily results in substantially similar works because identity subsumes substantial similarity. 4 Nimmer on Copyright § 13.03 (2024); *Silver Ring Splint Co. v. Digisplint, Inc.*, 543 F. Supp. 2d 509, 517 (W.D. Va. 2008). It is BrowserStack's burden to explain how this verbatim copying resulted in a work with a different concept and feel.

Deque has also presented evidence that BrowserStack copied the issue descriptions, Rule IDs (found in DevTools and the Rules Help Pages), and the How to Fix text (found in the Rules Help Pages). Dkt. 147-6 (How to Fix Table); Dkt. 147-7 (Issue Description Table); Dkt. 147-8 (Code Comparison Table). These texts are the medium through which Deque communicates with the user of its software. Thus, they are essential to the concept and feel of the programs.

---

[7] BrowserStack's proposed technical expert ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* at ¶¶ 41, 51–56.

BrowserStack copied that text verbatim to be used in the same type of program, meaning the ATT necessarily retains a similar concept and feel with respect to how it interacts with users. In sum, BrowserStack cannot establish a lack of intrinsic similarity.

> v.   **Application of the Copyright Act to BrowserStack India would not be an extraterritorial application**

BrowserStack protests that "federal copyright law has no extraterritorial effect, and cannot be invoked to secure relief for acts of infringement occurring outside the United States" in an attempt to avoid holding BrowserStack India liable for its admitted infringement. Dkt. 145, PageID# 1545 (citing *Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004)). However, the very next paragraph of *Palmer* states "the importation of the infringing work *is an infringing act occurring in the United States.*" *Id.* (emphasis added). As demonstrated below, BrowserStack India "imported" ATT to the US by sending it to BrowserStack US.

Recently, the D.C. Circuit adopted a useful test to determine whether application of the Copyright Act would be extraterritorial. In *Spanski Enters. v. Telewizja Polska, S.A.*, 883 F.3d 904, 914 (2018), the court applied the "focus inquiry" from *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), to determine whether application of a law would violate the prohibition on extraterritoriality. The focus inquiry requires identifying "conduct relevant to the Copyright Act's focus . . . by asking precisely what the Act regulates" and then determining where that relevant conduct occurred.  *Spanski,* 883 F.3d at 914. The *Spanski* court determined the Copyright Act "focuses . . . on protecting the exclusivity of the rights it guarantees." *Id.* Which meant the relevant question was whether a violation of those exclusive rights (found at 17 U.S.C. § 106) occurred within the United States. *See id.* Using this reasoning, the court held that the defendant was liable under the Copyright Act because, while the majority of the defendant's conduct occurred in Poland, defendant's conduct still caused copyrighted images to be displayed on U.S. computer

screens in violation of the author's exclusive right to public performance within the U.S. *See id.*

All Deque needs to show is that BrowserStack India sent a copy of the ATT to the United States and that it was distributed in the United States, which would show distribution of an illegal copy of Deque's works.[8] If (as BrowserStack claims) all development was done in India, then proof of the ATT being sold by BrowserStack US means that BrowserStack India sent a copy into the US. And, indeed, ATT is being distributed by BrowserStack US on the Chrome Webstore. Ex. 4, Chrome Webstore. Moreover, BrowserStack produced documents indicating it has a U.S. user base of approximately 3,004 users, which indicates the work was distributed within the U.S. after BrowserStack India sent it to the US. Ex. 9, ATT User Data. It simply does not matter that only BrowserStack US is listed on the Chrome Webstore, since "all parties in the chain of distribution are liable for copyright infringement." *Microsoft Corp. v. Pronet Cyber Techs.*, No. 1:08cv434, 2008 U.S. Dist. LEXIS 144931, at *14 (E.D. Va. Dec. 5, 2008).

## C.     BrowserStack Committed Actionable False Advertising

BrowserStack contends that Deque has "no evidence" that the accused false advertising statements are false. Not so.

First, BrowserStack made the claim in its comparative advertising that BrowserStack products are "5x faster" than Deque products without substantiation. This is sufficient to show that BrowserStack's claims are false. *See generally Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 589 (3d Cir. 2002); *Groupe SEB U.S., Inc.*

---

[8] The only effect that BrowserStack's extraterritorial argument has is that it shifts BrowserStack India's violation of Deque's rights under 17 U.S.C. § 106 from a violation of the right to create copies (106(1)) to a violation of the right to distribute copies (106(3)). This is entirely inconsequential since any violation of a Section 106 right constitutes copyright infringement. 17 U.S.C. § 501 ("Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 … is an infringer of the copyright or right of the author.").

*v. Euro-Pro Operating LLC*, 774 F.3d 192, 199 (3d Cir. 2014); *Castrol, Inc. v. Pennzoil Co.*, 779 F. Supp. 424, 437 (D.N.J. 1992), *aff'd*, 987 F.2d 939 (3d Cir. 1993). Moreover, BrowserStack advertised that Deque did not offer certain features when it fact it did. Importantly, BrowserStack's statement was about Deque products in general (not limited to DevTools). Dkt. 147, ¶ 44. As more thoroughly addressed in Deque's affirmative motion for summary judgment, these statements were false because such features are in fact offered by Deque in companion programs offered by Deque. Dkt. 147-11, PageID# 1849–50.

BrowserStack further complains that Deque has not identified specific customers that were misled. However, this is not required as BrowserStack's advertisements were "literally false." *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015). "In analyzing whether an advertisement is literally false, courts must determine, first, the unambiguous claims made by the advertisement, and second, whether those claims are false." *Id.* (internal quotations omitted). Literally falsity excuses the need to show consumers were actually misled. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) ("Where the advertisement is literally false, a violation may be established without evidence of consumer deception.").

With respect to the types of features found in Deque's products, BrowserStack claims Deque "admits" that Deque products do not support report consolidation, multipage scanning, auto deduplication, and a centralized reporting dashboard. Dkt. 145, PageID# 1546. BrowserStack supports this by citing Schneiderman's testimony. However, Schneiderman was not designated as a Deque witness to testify as to the false advertising claims. BrowserStack's own attorney's declaration contains a list of the topics for Schneiderman's deposition and nowhere does it mention false advertising. Dkt. 141, ¶ 15. During Schneiderman's deposition, Deque's counsel appropriately objected to questions regarding false advertising because they were outside the scope

of Schneiderman's deposition. Dkt. 145-4 PageID# 1655. Moreover, BrowserStack selectively omits the portion of Schneiderman's testimony where he states that he lacks personal knowledge about the at issue speed comparison claims, but notes that others at Deque have such knowledge. Ex. 2, Schneiderman Dep. Excerpts.

On the other hand, Barrell testified that Deque has a centralized reporting dashboard feature, a report consolidation feature, and a multipage scanning feature. Dkt. 147-11, PageID# 1849–50. The only features Deque products lacked (at the time) were auto de-duplication and screen reader integration. *Id.* Because BrowserStack offers no evidence that conflicts with Barrell's testimony, there can be no genuine issue of material fact regarding whether these claims are false.

The falsity of the "5x faster" claim is primarily due to a lack of substantiation. The "5x faster" claim is a concrete empirical claim. Concrete claims that are unsubstantiated are literally false. *See Novartis Consumer Health*, 290 F.3d at 589 ("a completely unsubstantiated advertising claim by the defendant is per se false without additional evidence from the plaintiff to that effect"); *Groupe SEB U.S.*, 774 F.3d at 199 (comparative advertising claim of superiority was literally false where speed measurement was not backed by testing); *Castrol*, 779 F. Supp. at 437 (advertising claim related to speed was literally false as it was unsubstantiated).

BrowserStack correctly notes that its "5x faster" claim is not based on any actual testing, but rather ███████████████████████████████████████████ ███████████████████████████████ *See* Dkt. 150-5, PageID# 2032. BrowserStack's speed calculations ███████████ ████████████████████████ ████████████████████████ Dkt. 150-5, PageID# 2033. Instead, ███ █████ ████████████████████████████████████████████████

██████ *Id.* at PageID 2032. One cannot ██████ an empirical claim. Furthermore, ██████

███████████████████████████████████████████████████████████████████

██████ *See id.* at PageID 2042. Because the core engine of both products is identical (and was built by Deque), one cannot be inherently "5x faster" than the other. There can be no doubt that the claim that the ATT is "5x faster" than Deque products is literally false.

## D. Deque's Unjust Enrichment Claim Provides Alternative Grounds for Relief

This Court has long held that "a plaintiff's unjust enrichment claim may survive a preemption challenge if plaintiffs can demonstrate that defendants were unjustly enriched by material beyond copyright protection." *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 938 (E.D. Va. 2010) (citing *Microstrategy, Inc. v. Netsolve, Inc.*, 368 F. Supp. 2d 533 (E.D. Va. 2005)). Thus, Deque's unjust enrichment claim goes *beyond* its claim for copyright infringement and includes a claim for recovery of all of the Deque property that BrowserStack misappropriated regardless of whether that material is subject to copyright protection. Deque's unjust enrichment claim provides a suitable substitute for recovery as to that material. Additionally, if BrowserStack is able to show that BrowserStack India's conduct does not fall under the purview of the Copyright Act, then unjust enrichment is a viable alternative to a copyright infringement claim. Similarly, while a contract generally precludes an unjust enrichment claim, BrowserStack argues in its MSJ that there is no contract between BrowserStack US and Deque. As set forth above, there *is* an enforceable contract between Deque and BrowserStack US, but in its brief BrowserStack argues out of both sides of its mouth by asserting *both* that there is no contract *and* that there can be no claim for unjust enrichment because there *is* a contract. BrowserStack cannot have it both ways and has not offered any viable argument as to why it should be awarded summary judgment on the unjust enrichment claim.

### E.    BrowserStack Is Not Entitled to Summary Judgment on Damages

BrowserStack's damages argument is incorrect both factually and legally.  Factually, in an attempt to avoid the consequences of its misconduct, and in an effort to try to prevent Deque from having the opportunity to present its case for damages to the jury, BrowserStack advances feigned claims of prejudice as a result of alleged technical squabbles with Deque's initial disclosures. Notably, Deque has contemporaneously provided updated initial disclosures, out of an abundance of caution. *See* Ex. 7.[9] Moreover, to the extent there were inadequacies in Deque's *initial* disclosures (which Deque denies), this is directly attributable to BrowserStack's improper withholding of evidence. *See* Ex. 6, Rule 56(d) Decl. Deque is not required to specifically calculate its damages; doing that is the province of the jury:

> Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result is only approximate. This, we think, was a correct statement of the applicable rules of law. Furthermore, a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.

*Eastman Kodak Co. v. S. Photo Materials Co*., 273 U.S. 359, 379 (1927).[10]

### i.    BrowserStack fails to establish that summary judgment on damages is warranted

As a threshold matter, BrowserStack fails to cite a single case in which a court granted summary judgment in an analogous context. Indeed, BrowserStack cites only three cases where a court granted summary judgment on damages: *TCL Commc'ns Tech. Holdings, Ltd. v.*

---

[9] To the extent BrowserStack needs more discovery on damages, justice requires an extension of deadlines rather than outright exclusion, particularly given the expedited nature of this Court's default scheduling rules.

[10] BrowserStack argues Deque is not entitled to statutory damages or attorney fees under the Copyright Act. Deque has not argued otherwise but reserves the right to seek attorney fees on other bases.

*Telefonaktienbolaget LM Ericsson*, No. SAVC 14-0341, 2016 U.S. Dist. LEXIS 140566 (C.D. Cal. Aug. 9, 2016); *Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*, No. SACV 16-01841, 2019 U.S. Dist. LEXIS 65212 (C.D. Cal. Apr. 15, 2019); and *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485 (S.D.N.Y. 2009). Each is inapposite.

In *TCL*, the Central District of California held that a plaintiff lacked standing to assert damages in relation to an unfair competition claim under California law as the non-movant failed to point to *any* admissible evidence related to damages. 2016 U.S. Dist. LEXIS 140566, at *12. In *Mission Viejo*, the Central District of California similarly granted summary judgment when there was a *wholesale* lack of evidence supporting an award of damages. 2019 U.S. Dist. LEXIS 65212, at *4–6. And, in *Gould*, the Southern District of New York granted summary judgment on damages where counter-plaintiff's attorneys expressly *conceded* that there was a complete lack of admissible evidence related to damages. 614 F. Supp. 2d at 490. Notably, courts have not hesitated to distinguish the above case law when admissible evidence is identified, as is the case here. *See, e.g.*, *N.Y. City Transit Auth. Express Scripts, Inc.*, No. 19-CV-5196, 2022 U.S. Dist. LEXIS 149324, at *11 n.5 (S.D.N.Y. Aug. 19, 2022) (distinguishing *Gould* on basis that plaintiff did not concede a damages expert was necessary to calculate damages, and acknowledging that the weight of authority demonstrates that summary judgment on damages should be denied if there is competing evidence); *Trade Links, LLC v. BI-QEM SA de CV*, No. 3:19-CV-00308 (KAD), 2021 U.S. Dist. LEXIS 185235, at *13 (D. Conn. Sep. 28, 2021) (same); G*enomma Lab USA, Inc. v. Venus Am. Corp.*, No. 14 Civ. 5831, 2017 U.S. Dist. LEXIS 59121, at *10 (S.D.N.Y. Mar. 27, 2017) (distinguishing *Gould* as the at-issue plaintiff never expressly conceded it could not calculate damages, complicated expert calculations were not needed under the circumstances, and defendant had the opportunity to conduct discovery on damages). Here, Deque clearly presented evidence of

an actionable injury (and damages). *See, e.g.*, Dkt. 147, ¶ 57; Dkt. 147-9, ¶¶ 20–21; Dkt. 147-26. Even more pointedly, as for Deque's false advertising claim, courts presume injury when advertisements are comparative (as is the case here). *See Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 451 (S.D.N.Y. 2012).

### ii.  Exclusion of Deque's damages evidence is not warranted

At pages 15-16 of its brief, BrowserStack relies on a line of inapposite case law regarding the exclusion of evidence under Federal Rule of Civil Procedure 37(c)(1). First, the cited cases generally relate to extreme delays in disclosures, which are not analogous here. *See Silicon Knights*, *Inc. v. Epic Games, Inc.*, No. 5:07-cv-275, 2012 U.S. Dist. LEXIS 63707, at *7 (E.D.N.C. May 7, 2012) (failing to provide computation of damages until one week prior to trial, two years after the close of discovery, and 5 months after the exclusion of plaintiff's damages experts); *Advanced Training Grp. Worldwide, Inc. v. Proactive Techs. Inc.*, No. 19-cv-505, 2020 U.S. Dist. LEXIS 141855, 2020 U.S. Dist. LEXIS 141855, at *7 (E.D. Va. 2020) (a damages calculation was never provided at any point, even after repeated requests to supplement); *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008) (relevant plaintiffs never made *any* initial disclosures); *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, No. 3:20CV400, 2023 U.S. Dist. LEXIS 93730, at *2–4 (E.D. Va. Jan. 11, 2023) (damages calculation was disclosed nearly a year after close of discovery); *cf. also Reed Constr., Inc. v. James River Ins. Co.*, No. C11-960 MJP, 2012 U.S. Dist. LEXIS 200361, at *1–2 (W.D. Wash. Apr. 6, 2012) (damages expert never provided a report). There is no comparable delay here.

Second, BrowserStack's cases involve instances where a movant actively and repeatedly pressed the non-movant for a calculation—but *never* received such calculations. *See, e.g.*, *Silicon*, 2012 U.S. Dist. LEXIS 63707, at *7 (plaintiff failed to supplement after being put on notice of defendant's challenge to the sufficiency of the disclosure); *Reed*, 2012 U.S. Dist. LEXIS 200361,

at *1–2 (did not supplement damages calculation in the face of a deficiency letter requesting supplementation); *Moke*, 2023 U.S. Dist. LEXIS 93730, at *2–4 (numerous inquiries into the relevant damages calculation were made with no meaningful response). BrowserStack fails to point to any such continuous efforts—to the contrary, BrowserStack's protestations are a clear afterthought (once BrowserStack's liability became unavoidably clear). In addition, BrowserStack fails to explain why the calculations in Deque's rebuttal expert report are insufficient to prevent its alleged (but unidentified) prejudice.

Third, BrowserStack relies on cases in which the at-issue damages documents were so voluminous that that it would be unreasonable to expect a party to predict damages theories absent a uniquely sophisticated disclosure. For example, in *Silicon Knights*, there were millions of documents produced (as opposed to the approximately 200 documents produced by BrowserStack). *See* 2012 U.S. Dist. LEXIS 63707, at *7. Here, the number of documents produced by BrowserStack directly relevant to the question of damages was exceptionally and uniquely sparse (at most a handful, under any interpretation of the evidence).[11]

_____

[11]

Fourth, BrowserStack improperly relies on case law in which there was a complete absence of justification for the cited delay. *See, e.g., Advanced Training*, 2020 U.S. Dist. LEXIS 141855, at *7. Here, not only is there justification, but any alleged delay is directly attributable to BrowserStack's own obstructive conduct. *See* Dkt. 72, Ex. 6, Rule 56(d) Decl., ¶¶ 3–14. Indeed, for example, unlike in *Advanced Training*, the vast majority of the probative evidence related to damages in this matter is in BrowserStack's—*not* Deque's—possession. *Compare id. with* 2020 U.S. Dist. LEXIS 141855, at *7.

Fifth, BrowserStack relies on case law in which the non-movant sought damages theories that were plainly foreclosed by governing law. *See, e.g.*, *TCL*, 2016 U.S. Dist. LEXIS 140566, at *12; *Advanced Training*, 2020 U.S. Dist. LEXIS 141855, at *7. As explained above (and more thoroughly in Deque's affirmative motion for summary judgment), that is simply not the case here.

Finally, the remainder of the cases cited by BrowserStack are irrelevant. For example, in *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003), the court excluded an expert opinion and set of calculations that was disclosed for the first time on the day of trial.[12] And, in *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th

---

[12] Numerous cases have distinguished *Sherwin-Williams* on applicable bases. *See, e.g.*, *Sarcopski v. State Farm Mut. Auto. Ins. Co.*, No. 99-36112, 2018 U.S. Dist. LEXIS 231396, at *3 (N.D.W.V. July 24, 2018) (distinguishing *Sherwin-Williams* as damages calculation were disclosed several weeks before trial instead of the day of trial); *Bocock v. Specialized Youth Servs. of Va.*, No. 5:14-cv-00050, 2015 U.S. Dist. LEXIS 144598, at * (W.D. Va. Oct. 23, 2015) (distinguishing *Sherwin-Williams* on basis that alleged deficiencies in initial disclosure were harmless and expert opinion was disclosed prior to trial, and finding reasonable excuse for failure to update disclosures when summary judgment schedule was expedited and the parties were preoccupied with summary judgment briefing); *ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co.*, No. 01CV100, 2005 U.S. Dist. LEXIS 47738, at *22–23 (W.D.N.C. May 31, 2005) (distinguishing *Sherwin-Williams* as the production of a limited set of documents four months prior to trial was sufficient to cure any alleged "incurable surprise"); *Grayson Consulting, Inc. v. Wachovia Sec., LLC*, No. 05-15042,

28

Cir. 2001), the court merely excluded the testimony of an expert identified a month before trial. The remainder of the cases cited by BrowserStack merely cite general standards and do not otherwise provide probative analysis. As such, BrowserStack's MSJ should be denied as it relates to damages.

F.    **There Is at Minimum a Genuine Issue of Material Fact Regarding Deque's Entitlement to Injunctive Relief**

BrowserStack contends that injunctive relief is no longer available here because there is no continuing harm because they have removed the infringing material from the ATT and have ceased their false advertising. BrowserStack's only evidence that the infringing material has been removed is a declaration from Jain. *See* Dkt. 145 at ¶ 14. This declaration is exceedingly unpersuasive since Jain is personally implicated in the copying, reverse engineering, and false advertising allegations at issue. *See* Dkt. 147 and accompanying evidence. Moreover, while BrowserStack has removed Deque's name from its "5x faster" claim, it still advertises its ATT as "5x faster" (presumably meaning 5x faster than the competition). This claim is still entirely unsubstantiated and thus literally false. *See supra.* At the very least there is a genuine issue of material fact as to Deque's entitlement to injunctive relief.

## IV.    CONCLUSION

BrowserStack cannot overcome the evidence supporting a finding of liability on all as to all of Deque's claims. Moreover, BrowserStack cannot establish as a matter of law that Deque should not be able to present its claim for damages to the jury. For these reasons, BrowserStack's

---

2011 Bankr. LEXIS 575, at *8 (Bankr. D.S.C. Jan. 21, 2011) (alleged deficiencies in disclosures were cured by notice provided through other means in the proceedings); *cf. Brown v. State Farm Mut. Auto Ins. Co.*, No. 3:14-cv-517, 2015 U.S. Dist. LEXIS 28574, at *4 (N.D. Fla. Mar. 9, 2015) (distinguishing *Sherwin-Williams* where, despite plaintiff's errors, justice warranted denial of the motion to exclude); *John H. Banks v. U.S.*, 75 Fed. Cl. 294, 298 (Ct. Cl. 2007) (declining to strike expert testimony under *Sherwin-Williams* where there was no meaningful prejudice).

motion for summary judgment should be denied and summary judgment as to liability should, instead, be granted in favor of Deque.

Dated: December 6, 2024

Respectfully submitted,

**DYKEMA GOSSETT PLLC**

 /s/ Charles W. Chotvacs
Charles W. Chotvacs (VSB  70045)
1301 K Street, N.W., Suite 1100 West
Washington, D.C. 20005
Telephone: (202) 906-8600
cchotvacs@dykema.com

**BODMAN PLC**

Justin P. Bagdady (*pro hac vice*)
Spencer M. Darling (*pro hac vice*)
201 S. Division Street, Suite 400
Ann Arbor, MI 48104
Telephone: (734) 930-2727
jbagdady@bodmanlaw.com
sdarling@bodmanlaw.com

Stephen P. Dunn (*pro hac vice*)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
Telephone: (248) 743-6031
sdunn@bodmanlaw.com

*Counsel for Plaintiff Deque Systems Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of December, 2024, the foregoing Opposition to Defendants' Motion for Summary Judgment was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which shall send notification of electronic filing to all counsel of record.

                                /s/ Charles W. Chotvacs
                                Charles W. Chotvacs