# EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION


 3   --------------------------x
     DEQUE SYSTEMS INC.,          :    Civil Action No.:
 4                                :    1:24-cv-217
               Plaintiff,         :
 5        versus                  :    Friday, September 27, 2024
                                  :    Alexandria, Virginia
 6   BROWSERSTACK, INC., et al.,: Pages 1-46
                                  :
 7              Defendants.       :
     --------------------------x
 8

 9        The above-entitled motion to compel was heard before
     the Honorable William E. Fitzpatrick, United States
10   Magistrate Judge.

11            A P P E A R A N C E S:

12   FOR THE PLAINTIFF:    STEPHEN DUNN, ESQUIRE
                           BODMAN PLC
13                         201 W. Big Beaver Road
                           Troy, Michigan  48084
14                         (313) 259-7777

15                         BRENT OLSON, ESQUIRE
                           DYKEMA GOSSETT PLLC
16                         1301 K Street, NW
                           Suite 1100 West
17                         Washington, D.C.  20005
                           (202) 906-8600

18   FOR THE DEFENDANTS:   ROMAN LIFSON, ESQUIRE
                           CHRISTIAN & BARTON
19                         901 E. Cary Street
                           Suite 1800
20                         Richmond, Virginia  23219
                           (804) 697-4164
21
                           CAROLYN CHANG, ESQUIRE
22                         PHILLIP HAACK, ESQUIRE
                           MARTON RIBERA SCHUMANN & CHANG LLP
23                         548 Market Street
                           Suite 36117
24                         San Francisco, California  94104
                           (415) 360-2511
25
```

1

```
 1   TRANSCRIBER:            STEPHANIE M. AUSTIN, RPR, CRR
                             Transcriber
 2                           United States District Court
                             401 Courthouse Square
 3                           Alexandria, Virginia  22314
                             (607) 743-1894
 4                           S.AustinReporting@gmail.com

 5        (TRANSCRIPT PROCEEDINGS RECORDED BY THE FTR SYSTEM)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                              2
```

1                    P R O C E E D I N G S

2          THE DEPUTY CLERK:  Deque Systems Inc. versus

3    Browserstack, Inc., et al., Case 1:24-cv-217.

4          Counsel, please note your appearances for the

5    record.

6          MR. DUNN:  Good morning, Your Honor.  May it

7    please the Court.  Stephen Dunn on behalf of Deque Systems

8    Inc., together with local counsel, Brent Olson of Dykema

9    Gossett.

10         MR. LIFSON:  Good morning, Your Honor.  Roman

11   Lifson with Christian & Barton.  And with me today are

12   Carolyn Chang and Phillip Haack of the Marton Ribera firm

13   who are lead counsel for the Browserstack defendants, and

14   Ms. Chang will take the lead on the arguments from our end

15   today.

16         THE COURT:  All right.  Good morning, everybody.

17   And, I apologize, don't get too comfortable.  Here's what I

18   will propose we do this morning.

19         What I can tell you all is your -- just based on

20   the pleadings, I can tell you, your motion to continue the

21   final pretrial is denied.  It will go forward before

22   Judge Trenga.  I believe it's set in a few weeks.

23         The thing to do, and what I suspect is going to

24   happen if we have to go through and resolve the merits of

25   the motions today, is that nobody's going to be particularly

                                                              3

1   happy.  In my never-ending quest to make everyone happy,

2   here's what I think we should do today.  Let me recess this

3   until the end of the docket, or at least for some period of

4   time.  I would ask you to call your clients and see if your

5   clients are available for a settlement conference next

6   Wednesday or next Thursday.  Unfortunately next week I've

7   got settlement conference Monday, Tuesday and Friday.  So

8   Wednesday and Thursday are the only days that I have

9   available.  And I recognize that Thursday is Rosh Hashanah,

10  so that may present issues.  If it does, we'll do our best

11  to obviously schedule around that.

12          I can tell you with a great degree of confidence

13  that when you get to the final pretrial in the middle of

14  October, that Judge Trenga, if we have not had a settlement

15  conference, will order you to have a settlement conference

16  before me within a very short period of time.  So I think it

17  makes sense to give this a shot.  Right.  And to do it

18  before we have to resolve these motions, and to do it before

19  Judge Trenga orders you to do it.

20          Now, if the scheduling doesn't work, if it can't

21  happen, that's fine, we'll reconvene here, and I'll -- we'll

22  go through the motions, I'll hear argument, and I will give

23  you very clear definitive rulings today as to what your path

24  forward is.  But what I would really -- I think it's really

25  in everybody's interest to see if we can't find a way to sit

4

```
 1   down next week and see if we can find some common ground.
 2            The -- what I would then do is, if your clients
 3   are willing -- and I realize that there are logistics
 4   issues.  We can figure out who we can get by phone.  As long
 5   as we have somebody who is a decision-maker who is
 6   available, we can figure this out.
 7            But if we can do that, I think it would make sense
 8   for everybody if we arrange something for next week, and
 9   I'll just carry the motions until next Friday.  And if the
10   settlement conference works, great, the motions are moot; if
11   it doesn't work, then, you know, we've only lost a week,
12   which, honestly, given the schedule that you're on is still
13   significant, but I think it's -- I think it's worth the
14   risk.
15            If either client does not want that, if you just
16   want to play out the string and, you know, continue where we
17   are for the next few weeks and then wait for Judge Trenga to
18   order the settlement conference, that's entirely your call.
19   But I'm just giving you this option, and I just think, at
20   least to me, it makes sense to give it a try.
21            So what I would propose to do now is just put this
22   until, you know, maybe -- say until 11:00.  See if you can
23   get in touch with your clients, see if they're willing to do
24   this.  See if Wednesday or Thursday works for everybody, and
25   let's give that a try before we have to wrestle with what we
```
                                                              5

```
 1    have in front of us.  Okay.
 2            Does anybody have any enormous objection to that
 3    proposal or any huge heartburn?  Again, if the answer is no
 4    from either side, that's okay.  We'll just -- you know,
 5    we'll just continue today as planned.
 6            MS. CHANG:  Your Honor, my only concern is our
 7    clients are in India, so there is a time difference.  As
 8    long as people can be available by phone or remotely.
 9            THE COURT:  That's fine.  Absolutely.  And we've
10    done many settlement conferences where the parties are
11    overseas.  We just have to -- you know, everybody just has
12    to be flexible, but we can certainly make that work.
13            MS. CHANG:  Understood.  Thank you.
14            THE COURT:  Would you be able to get in touch with
15    somebody in the next hour?
16            MS. CHANG:  That might be difficult, but, you
17    know, I think our side has always been open to and willing
18    to have settlement discussions.
19            THE COURT:  Okay.  Well, why don't we just see
20    what we can do.  I have a number of other matters I have to
21    take up, and maybe just say reconvene here around 11:00, and
22    we'll see where we are.
23            MS. CHANG:  Okay.  Thank you, Your Honor.
24            MR. DUNN:  Thank you.
25            THE COURT:  All right.  Thank you.
```

6

```
 1                         (Case passed.)

 2            THE DEPUTY CLERK:  Deque System Inc. versus

 3    Browserstack, Inc., et al., Case Number 1:24-cv-217.

 4            THE COURT:  Nobody's getting their binders out, so

 5    I'm hoping that's a good sign.

 6            MS. CHANG:  Your Honor -- this is Carolyn Chang

 7    for Browserstack.

 8            Browserstack is available and willing to

 9    participate on Wednesday -- on Wednesday or Thursday of next

10    week for a settlement conference.

11            THE COURT:  All right.

12            MR. DUNN:  Your Honor, Stephen Dunn for Deque

13    Systems Inc.

14            We're happy to participate in a settlement

15    discussion.  In order for that to be productive, we've

16    reduced the number of document requests that we have for

17    Browserstack, and these documents, this financial data,

18    relates directly to our damages, Your Honor.

19            If we're going to talk about settlement and it's

20    going to be productive and we're all going to be here -- and

21    plaintiff is more than willing to make that happen as soon

22    as next week, as you have suggested -- we just need some

23    very important reduced list of financial data from

24    Browserstack.  I've given them the list back when we were in

25    the hallway.  They did not confirm that they would produce
```

7

```
1    it to us; they just came right in here to the courtroom,
2    Your Honor.  But if we can just get that isolated data, then
3    we can give it to our expert witness, he can calculate our
4    damages and quantify our economic losses as quickly as
5    reasonably possible, and then we can meet here and
6    productively discuss a potential resolution, Your Honor.
7              MS. CHANG:  Your Honor, I haven't had an
8    opportunity to get in touch with my clients.  They are in
9    India, and it is 9 p.m. over there right now, so -- with
10   respect to their request.
11             But I will say the request that they are asking
12   for, to have the settlement conference is the same that
13   we're disputing in the motion to compel.  There is a single
14   product at issue here, and they want financials for our
15   entire suite of products that it's not at issue.
16             I think your analogy was fourth quarter of
17   discovery.  I think we're in the last two minutes of the
18   fourth quarter.
19             THE COURT:  That's exactly -- you know, it's funny
20   you say that.  That's exactly the --
21             MS. CHANG:  And we're --
22             THE COURT:  And we're at the two-minute warning,
23   and we have to make sure that people's mindsets aren't still
24   warming up.
25             MS. CHANG:  And I am being told for the first time
```

8

1   by counsel that there is a new product they're going to be

2   accusing that's not, you know, alleged in the complaint at

3   issue here.  I'm being told that there is bundling of our,

4   you know, accused product with others while we've already

5   made representations to them that the thing that they're

6   pointing to is not the product they're accused; that's a

7   different feature in a different product.

8           So this is the financials they're arguing about

9   that I don't have an ability to get an answer from my

10  client, but I know at least with respect to the motion to

11  compel, that was an issue we were resisting because of

12  relevance.

13          THE COURT:  Let's do this.  Sorry, go ahead.

14          MR. DUNN:  Your Honor, just for the record and so

15  that everyone's clear, Browserstack took our software code,

16  and then they sold it as a standalone product.  Then we

17  brought our case.  Then Browserstack apparently stopped or

18  disguised their sales of our product as a standalone

19  product, and now they bundle it in a package where a toolkit

20  of products -- a suite of products that they sell to their

21  customers.

22          Browserstack's customers purchased this bundled

23  set as a part of a toolkit, and they're most interested in

24  Deque's product that Browserstack stole and now sells in

25  this package.

                                                            9

```
 1              If we're going to talk about a resolution of this

 2    case, Deque has substantial economic losses, we need to have

 3    some data from Browserstack to understand --

 4              THE COURT:  I know your position.  I got it.  I

 5    understand your position.

 6              MR. DUNN:  -- our losses.

 7              THE COURT:  Why don't we do this, and so we'll

 8    resolve that issue today.  The issue we'll resolve -- if

 9    that is a -- and I understand your position.  If that's a

10    necessary prerequisite to really having a constructive

11    settlement conference and everybody's available next week,

12    let's -- we'll resolve that single issue today, that way

13    everybody at least knows what the issue is going -- or what

14    the position is going forward.

15              Let's do this.  I understand it's 9:00 in India.

16    I actually have this, and then I have a couple of criminal

17    matters I have to -- I have to handle as well.

18              Why don't we -- why don't you see if you can still

19    make some efforts to get in touch with your client.  Why

20    don't you all give it a shot to see if you can find some

21    common ground on these financials, and let's reconvene -- or

22    you don't have to and you can just go to lunch.

23              Why don't we reconvene at 2:00, and I will resolve

24    the -- that specific issue, and we'll set up a specific day

25    and time to begin the settlement conference, and, you know,
```

                                                                  10

```
 1   we'll just sort of play that out.
 2            MR. DUNN:  Your Honor, that sounds fine -- thank
 3   you -- with this caveat.  I have a flight back to Detroit
 4   tonight at 5 p.m., and so --
 5            THE COURT:  You will make your flight.
 6            MR. DUNN:  Thank you.
 7            MS. CHANG:  (Inaudible.)
 8            THE COURT:  Well, I'll say this, I won't be the
 9   reason you don't make your flight.
10            All right.  I'll see you all at 2.
11            MS. CHANG:  Thank you, Your Honor.
12            MR. DUNN:  Thank you.
13            THE COURT:  I assume you're flying out of
14   National?
15            MR. DUNN:  Yes, Your Honor.
16            THE COURT:  Piece of cake.
17            MR. DUNN:  (Inaudible.)
18            THE COURT:  Okay.
19                      (Case passed.)
20            MR. DUNN:  Good afternoon, Your Honor.  May it
21   please the Court.  Stephen Dunn for Deque Systems Inc.,
22   together with co-counsel, Brent Olson of Dykema Gossett.
23            THE COURT:  All right.  So we're back for -- and
24   Mr. Dunn, I know you have a plane to catch.  I promise that
25   will be -- we'll handle this quickly.  Get you to the
```

11

1    airport in plenty of time.

2            So as I understand it, or as I can recall, we're

3    going to resolve the one issue now with respect to the

4    RFP 49, which is the documents with respect to different

5    financial information.

6            We will set up a -- I'll carry all the other

7    motions at least until next Friday, but we'll see where that

8    goes, but we'll arrange for a settlement conference next

9    week.  Is that still where everybody is?

10           MR. DUNN:  Yes, Your Honor.  We're happy to appear

11   for settlement discussions next week, we just think that if

12   they're able to produce to us, please, the condensed list

13   that we provided to counsel, which I understand counsel was

14   going to call her client about during our break that we just

15   had, then we're able to have that settlement discussion in a

16   constructive way when we're here together next week.

17           THE COURT:  I understand.  So were you able to --

18   is there still a dispute, or were you able to --

19           MS. CHANG:  Your Honor, we were not able to reach

20   our client given the time zone change, and so if -- we are

21   prepared to discuss Document Request 49 if the Court would

22   like to hear.

23           THE COURT:  Okay.  All right.  Why don't you go

24   first, and I'm happy to hear argument why you think this is

25   not properly discoverable.

                                                              12

1              MS. CHANG:  All right.  So the document request is

2    documents sufficient to identify the amount and sources of

3    all revenues Browserstack has received directly or

4    indirectly from the accessibility toolkit.

5              So for Your Honor's benefit, the accessibility

6    toolkit is the accused product here at issue.  And it is

7    called the accessibility toolkit, but what it is is the

8    testing product we would test for what we call web testing,

9    so it's for websites.  And so the name of it is the

10   accessibility toolkit.

11             So we have produced our revenue numbers for all

12   sales of the accessibility toolkit for, I believe, our first

13   sale through August.  We've also broken down cost, and we've

14   broken it down by U.S. revenue as well as rest-of-the-world

15   revenue.

16             So what they're now asking for is I think they're

17   trying to hook it to the revenues indirectly from sales of

18   this accessibility toolkit, and what they've told us is that

19   they want our revenue numbers for all of our products.

20             So to give you a little context, Plaintiff Deque

21   sells products related to testing -- products and services

22   relating to testing accessibility.  Browserstack is a

23   company that sells one product for web testing of

24   accessibility, sells one product for testing of mobile apps

25   for accessibility, and then a whole bunch of other products

13

1    for all sorts of different web and mobile app testing not

2    related to accessibility.

3              So they're asking for our financials for

4    everything.  To give you a little context, I think we have

5    about 70 U.S. customers for the product at issue.

6    Worldwide, we have about 50,000 customers.  So they're

7    asking for stuff that is not relevant to what's been alleged

8    or accused in this case, and at a volume and a sensitive

9    nature that our client is very reluctant and doesn't think

10   should be at issue in this case.

11             I don't want to put into, you know, plaintiff's

12   mouth what they're going to tell me is -- tell the Court as

13   to why they think that additional is relevant, but they've

14   cited to us today in our break two reasons why they think

15   this information should be provided.

16             Number 1 is because they say that our

17   accessibility toolkit product, the one that's accused, is

18   sold in a bundle with other products that we sell, and

19   that's not true.  We have other products that have an

20   accessibility testing feature, but it is not for web

21   testing, and it is not the product that they've accused.  So

22   it's a different cloud-based screen reader technology.  Not

23   at issue in this case.

24             The second reason I heard for the first time --

25   oh, in addition, their argument on that was they only

                                                          14

```
 1   recently just discovered that we bundle that.  And that's
 2   just not true.  That feature and that description on our
 3   website has been up and available since prior to the filing
 4   of this lawsuit.  So that information was available to them.
 5   If they wanted to raise that issue with us earlier, we would
 6   have told them that's not the product at issue here.
 7            So the second reason that they cite is that -- and
 8   I've heard for the first time today is that they have a
 9   newly-accused product, and they want to accuse our testing
10   for mobile apps.
11            So just to give you a little bit of context, we
12   have a product that is a browser extension.  So it's a piece
13   of software that kind of hooks onto your web browser when
14   you're surfing the web.  So as you're browsing a website, it
15   will operate the software and be able to detect any issues
16   with the website as it's going through.
17            Separately, we have developed a software that
18   tests things for either on the iOS platform when you have an
19   app, or on an Android platform when you have an app.  So
20   these are completely different products, require completely
21   different coding and run in a different way because you have
22   a different system that you have to be testing, whether it
23   be a website or a mobile app.
24            So they told us for the first time today that they
25   have belief of wrongdoing with respect to mobile
```

15

```
 1   accessibility testing.  We've never heard of that.  I have
 2   no idea or basis of understanding what their claim or their
 3   reasoning for believing that is.  If it's based on whatever
 4   they allege was the wrongdoing with respect to the web app,
 5   that's hard to understand because the technology was
 6   different.  And, quite frankly, it wasn't at issue when
 7   Request 49 was issued.  It's still not at issue in this case
 8   because it's not accused.  It's never been identified in any
 9   interrogatory response by them as to what's the accused
10   product in the case.  It's not what's alleged as the accused
11   product in this case.  So we believe we've produced all
12   financials that is relevant to this case, and we don't think
13   it's appropriate to open the door to all sorts of products.
14           I mean, I think the analogy we like to use is if
15   you go to Apple and you're accusing them of some wrongdoing
16   with respect to the AirTag, that you want financials with
17   respect to all their computers, all their iPhones, all their
18   iPads, and we just don't think that's appropriate in this
19   case.
20           THE COURT:  Thank you.
21           MR. DUNN:  Thank you, Your Honor.  Stephen Dunn
22   for Deque.
23           When I first got engaged a couple of week's ago, I
24   didn't even understand what Deque does, and it's helpful to
25   have a general understanding of what Deque does so we
```

16

1    understand what Browser did -- Browserstack did that's

2    wrong.

3         Under the American for Disability Act, the ADA,

4    for example, Internet websites have to be accessible to

5    folks that have disabilities, vision-impaired folks,

6    hearing-impaired folks, and so on.  Deque spends years and

7    tens of millions of dollars developing proprietary software

8    that customers, including the United States, purchase so

9    that they can, with the benefit of Deque's software,

10   understand whether certain Internet websites are compliant

11   with the ADA and other legal authorities.

12        Deque, Your Honor, is the worldwide leader in

13   developing this type of Internet accessibility software

14   testing.  Deque, Your Honor, licensed a handful of

15   individual licenses to Browserstack.  We sold them a handful

16   of licenses.

17        We later found out that instead of complying with

18   the terms of the written licensing agreements, which

19   prohibit copying, which prohibit reverse engineering, which

20   prohibit Browserstack from taking our propriety software and

21   deploying it to their own systems and processes for their

22   own customers, that's exactly what Browserstack did here.

23   They stole our software, and, by doing that, they avoided

24   years of development costs, time and substantial expense

25   along the way.  That's what this case is about.

                                                        17

1           Now, if we're to have a meaningful settlement

2    discussion next week, we have to be able to provide to our

3    damages expert, Mic Kahaian, the financial data that we're

4    seeking here.  And if Your Honor -- I heard you say in

5    another matter earlier this morning, it's relevant, it's

6    proportionate, and it's necessary, and in order to have a

7    fair shot at a trial that's happening soon, Deque's damages

8    expert has to understand how much Browserstack has benefited

9    from its misconduct in this case.

10          THE COURT:  But the alleged misconduct, as I

11   understand it, in the face of RFP 49 is limited to the

12   accessibility toolkit.  So -- and how is -- how is this just

13   not a significant overreach?  I mean, if they're agreeing to

14   give you their financials with respect to the accessibility

15   toolkit, where is the disconnect?

16          MR. DUNN:  Your Honor, they've not done that.

17   Here's what they've done, they've provided financial data

18   with respect to a couple of lines of code that they copied,

19   stole, and implemented into their software package that they

20   make available as a bundle.

21          For a time, as I mentioned earlier this morning,

22   they sold the stolen software code as an isolated product in

23   itself.  Later, as we understand, and as we allege, they

24   packaged this code, reverse engineered it, and now they sell

25   it as a product with other products in a package or a

                                                            18

1   bundle.  They want to artificially and arbitrarily limit our

2   discoverable data in this case to only what they want to

3   talk about they stole, and that's not what this case is

4   about.

5          THE COURT:  Well, here's -- here's -- tell me

6   where I'm sort of missing the link and the chain here.  And

7   I will tell you, timing is an issue.  And I realize you just

8   got in the case a couple weeks ago, but the allegation with

9   respect to the accessibility tool, I understand it, I

10  understand the theory behind it, I understand your

11  allegations.  I obviously don't know the discovery that's

12  been developed between the parties, but I certainly

13  understand your theory.  Whether it's provable, whether it's

14  supportable, I don't know, but I certainly understand your

15  theory.

16         If your theory is now that there was essentially a

17  misappropriation of your client's intellectual property or

18  trade secret, whatever it is, and it was now -- it's been

19  embedded now into other products, you're going to have to

20  develop that, it seems to me, through discovery, which

21  products, before you get their financials on all of their

22  products.

23         MR. DUNN:  Yes, sir.  That's part of -- that's

24  part of it, and I would like the opportunity to do that,

25  but --

                                                        19

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

1          THE COURT:  I'm not sure you have time.

2          MR. DUNN:  Your Honor, I have filed a motion for a

3     modest extension of a couple of dates, not the final

4     pretrial date and not the trial date.  I've asked the Court

5     in our motion papers to push just two dates just for two

6     weeks.  That is the expert disclosure date, moving that to

7     October 7.  That's all.

8          THE COURT:  That's not really a two-week

9     extension.  I mean, your -- the plaintiff's -- your expert

10    disclosures were due in August.

11         MR. DUNN:  But, Your Honor, that was true.  On

12    August 9, those were due.  Do you know when they produced

13    documents to us?  They produced 75 documents to us, that's

14    it, on August 8, the day before.

15         How in the world is that fair when, in this case

16    that you're talking about correctly, involves a lot of

17    information that we are entitled to discover.  The day

18    before the disclosures were due, they've produced for the --

19         THE COURT:  But that issue can't come to me on

20    September -- wherever we are, on September 27th.

21         MR. DUNN:  That happens to be the hearing date,

22    Your Honor, but we moved very rapidly, and we immediately

23    disclosed to them this information.  There was no delay by

24    us.  The delay is on their part, the people that stole the

25    information that we're here to talk about.

                                                          20

1          Imagine a scenario where they steal our

2     information, violate our agreement, then run the clock out

3     on us by never giving us any information until the day

4     before the disclosures were due, Your Honor.  How is that

5     operating in good faith?

6          I looked at the court's code of pretrial conduct

7     that includes a preamble signed by the chief justice, and he

8     said in that, Your Honor, that people are to conduct

9     discovery in good faith.  People are to -- objections to

10    interrogatories, it says, requests to production shall be

11    made in good faith and must adequately be explained and

12    limited in a manner that fully apprises the adversary of the

13    material in dispute.  That's on the court's website for its

14    code of pretrial conduct discovery practice, page 8, Item 3.

15         What these people did, Your Honor, is steal our

16    data, hide the information and then run out the clock.

17    We've had no opportunity at all to understand what it is

18    exactly that they did.  Now they've narrowed us down, we

19    have no time, and they've not given us the information.  And

20    the Court appropriately wants us to have a settlement

21    discussion next week without the information to meaningfully

22    talk about our damages.

23         THE COURT:  I'm just telling you, it's in

24    everybody's interest to have the settlement because, you

25    know -- I'll say with respect to dates -- and I understand

21

```
1    that this district is a little bit different than some of
2    our sister districts.  You know, it's always interesting,
3    right, there's one set of federal rules and one set of
4    statutes, but every district seems to have its own legal
5    culture.  Deadlines just are not routinely extended here,
6    and they're almost never extended after the fact.
7            I understand your argument, I understand your
8    position.  I'm very sympathetic to the fact that you got
9    into this case very late.  And I don't know what the issue
10   was with prior counsel, but there was clearly a lot for you
11   to get your arms around a very short period of time.  But at
12   least right now -- and I'm not even sure how it necessarily
13   helps you with respect to the settlement conference.
14           I don't know how having such a wide swath of
15   financial information from the defendants that is not
16   tethered to the specific allegations of what was
17   misappropriated.  And if your position right now is you
18   don't know what was misappropriated because, you know,
19   you're still fleshing that out, but I'm not sure that not
20   having the financials married up with your specific
21   allegations is appropriate.
22           MR. DUNN:  Your Honor, I'm asking just for four
23   things, and it is tethered, and it is proportionate,
24   relevant and necessary, words the Court used in a different
25   similar situation this morning.
```

                                                                    22

1              I'm asking for monthly internal financial

2    statements, I'm asking for --

3              THE COURT:  For everything -- you're asking for

4    monthly internal financials for the entire corporate entity.

5              MR. DUNN:  That relate to the products that they

6    stole, reverse engineered and now incorporate into other

7    products.

8              THE COURT:  I thought you didn't know which

9    products they were.

10             MR. DUNN:  Your Honor, we're doing our best under

11   different circumstances to --

12             THE COURT:  Do you not know which products they

13   were?  I mean, I don't understand how opening up their books

14   to everything that's not specifically connected to the

15   products that you think were -- you know, were enhanced by

16   the alleged misappropriation of information.

17             MR. DUNN:  Your Honor, the products are identified

18   as best we reasonably can in our amended complaint.  They

19   are there identified as best as we reasonably can right here

20   in document Number 44-1.  They are.  It's nonsense for

21   Browserstack to contend that they don't know what products

22   we're contending.  They're right here.

23             I did tell them in good faith in the conference

24   room this morning that I learned last night about another

25   product that they just stole from Deque that relates to

```
 1    mobile accessibility testing.  I haven't moved on that yet.
 2    Because you wanted us to conduct a settlement conference,
 3    I'm trying to make sure that that's, as you put it,
 4    constructive.  And the only way that I know to make a
 5    settlement conference constructive is if my client is able
 6    to understand the extent to which they've been damaged by
 7    Browserstack's egregious theft.
 8              THE COURT:  How many products have you identified
 9    in your amended complaint?
10              MR. DUNN:  I don't have that number committed to
11    memory off the top of my head.
12              THE COURT:  But what -- so I understand that --
13    let me ask counsel for Browserstack.
14              I understand that this is beyond the plain
15    language of RFP 49, but if they have listed and given you
16    notice of what their claims are with respect to specific
17    products, why can't you provide financials with respect to
18    those products?
19              MS. CHANG:  Right.  So the thing that -- my
20    understanding -- and we're looking in the first amended
21    complaint, I apologize for not knowing that off the top of
22    my head -- it's been defined as accused products.  The
23    accused product is the accessibility toolkit.  That is the
24    web extension, browser extension product that we have that
25    tested for accessibility issues.  That's what we provided
```

1   financials on.

2           So we sell a product, a standalone that you --

3   people buy a monthly subscription -- an annual subscription

4   that we realize income on monthly.  And so we have given

5   them the revenue we have collected from those subscriptions

6   for that product from first sale to -- through August.

7           THE COURT:  Let me just -- let me log on, because

8   if -- if there's an amended complaint -- so are you saying

9   that all the products that they've identified in the amended

10  complaint are part and parcel of this accessibility toolkit?

11          MS. CHANG:  Yeah.  So it's called a toolkit, but

12  it's a single product.

13          So the allegations in the complaint is that they

14  have a web browser -- a web extension accessibility web

15  testing product that we had access to and copied stuff

16  from --

17          THE COURT:  All right.

18          MS. CHANG:  -- and used it to make our web

19  extension, browser extension, web testing product.

20          Our web browser extension testing product is

21  called the accessibility toolkit.  That's the product they

22  identified in their original complaint, as well as their

23  first amended complaint, and that's why their discovery

24  requests are always about the accessibility toolkit.

25          That is the only product at issue that we were

                                                        25

1    aware of up until this morning.  That's what we've been

2    resisting producing anything else and not really clear on

3    what else they're looking for.

4            THE COURT:  So where in the first amended

5    complaint does it identify products beyond the accessibility

6    toolkit?

7            MR. DUNN:  Your Honor, throughout the first

8    amended complaint, we discuss multiple products, and it's

9    these products, plural, that we're seeking to find out, the

10   extent to which not only they stole, but they used and they

11   now sell either as that specific line or lines of code, but

12   also that they reverse engineered.

13           THE COURT:  Why does RFP 49 only mention the

14   accessibility toolkit?

15           MR. DUNN:  The toolkit, Your Honor, includes

16   multiple products, as we understand it.

17           THE COURT:  Okay.  Well, that was my question.

18   That was my question.

19           MR. DUNN:  Understood.

20           THE COURT:  I mean, I think that's the disconnect

21   between counsel.

22           MS. CHANG:  If I may.

23           THE COURT:  Please.

24           MS. CHANG:  All right.  I think I understand.

25           So the accessibility toolkit is a single product

                                                              26

```
 1   that has many components to it.  Our position in this case

 2   has been the stuff they said we copied only belongs to one

 3   component of a multi-component product.

 4           THE COURT:  You're saying it involves --

 5           MS. CHANG:  So we gave financials for the entire

 6   product.  We don't know how to give revenues just for a

 7   component of the product.  So the thing that they talk about

 8   where there's multiple things they identify in the first

 9   amended complaint are the different components in our one

10   product.

11           THE COURT:  But that's all subsumed in the

12   information you've already --

13           MS. CHANG:  Correct.  Correct.  We have no way to

14   separate that out.

15           THE COURT:  That seems to make a lot more sense.

16           MS. CHANG:  Yeah.

17           MR. DUNN:  Your Honor, I don't know, and I don't

18   think it's correct that they've given me all of the things

19   that we need to understand our damages, and that's why we're

20   here.

21           THE COURT:  Well, what are you asking for?  What

22   do you think you're entitled to under RFP 49 that they

23   didn't give you?

24           MR. DUNN:  I sent to them this morning a condensed

25   list of five items that we need to understand our damages,
```

27

```
 1   Your Honor, and --

 2             THE COURT:  What are they?

 3             MR. DUNN:  Your Honor, we would like monthly

 4   financial statements.

 5             THE COURT:  Okay.  But monthly financial

 6   statements of what?  Of the entire corporate entity?

 7             MR. DUNN:  Of their financial performance as it

 8   relates to the products that they stole from us.

 9             THE COURT:  Okay.  Let me just back up, because we

10   need to sort of I think define these terms a little bit.

11   Right.

12             Now, I agree -- and it doesn't sound like counsel

13   disagrees -- that you are certainly entitled to the

14   financials behind the accessibility toolkit.  No question

15   about it.  And if the accessibility toolkit involves

16   multiple components and what they say is they -- and you

17   think that multiple components contain the information that

18   was improperly taken from your client, but it's all subsumed

19   in this toolkit and they can't parse this out, but they've

20   given you the financials for this entire toolkit, then that

21   seems to be, Number 1, responsive to 49, and it seems to me

22   really all you're entitled to.

23             So when you ask for their monthly financials, are

24   you saying you don't have that for the accessibility

25   toolkit, or are you looking at it, or are you requesting it
```

                                                             28

```
 1   for other -- beyond that?
 2           MR. DUNN:  Yes, Your Honor.  Because it's not just
 3   the revenue that they enjoyed as a result of their sales of
 4   products included in the accessibility toolkit from
 5   information that they stole from Deque.
 6           Again, it's -- the other information that we have
 7   requested here, Your Honor, relates to the development costs
 8   that they avoided by stealing this information from Deque
 9   and rapidly accelerating their appearance in the market, all
10   of which relate to Deque's damages in this case under, for
11   example, our unjust enrichment claim.
12           THE COURT:  Okay.  So now you're basically -- it
13   seems like we're moving the goal post a little bit.
14           If that was a -- if what you want is a -- if what
15   you're trying to say is, you know, they didn't have to
16   expend resources to develop certain intellectual property
17   because they took it from you, how are their monthly
18   financials -- how is it connected to that issue?
19           MR. DUNN:  Because, Your Honor, I've only been
20   allowed to verbalize to the Court so far the first of the
21   five items on the condensed list that I've presented to them
22   this morning.
23           THE COURT:  I'm trying to take them one at a time.
24           MR. DUNN:  Yes, Your Honor.
25           So the next item on the list is a report detailing
```

29

1    sales by customer name, by month and by product offering.

2    If we can have that information, Your Honor, then we'll

3    know --

4            THE COURT:  You're not answering a very specific

5    question that I have.

6            The very specific question that I have is, you're

7    entitled to discovery regarding the accessibility toolkit,

8    different components of the accessibility toolkit.  Right.

9    It seems to me you're asking for things beyond that.

10           MR. DUNN:  Your Honor, they've given me, as I

11   understand it, a small subset of information that relates to

12   sales over a period of time, she said through August, of the

13   accessibility toolkit.  Remember, it's not just sales of the

14   accessibility toolkit, it's development costs of the

15   accessibility toolkit, and it's these other items that I've

16   got on a very short list that I'm trying to enunciate for

17   the record so that everyone can please understand the

18   information we are requesting is related to the

19   accessibility toolkit, and it does fall under what we've

20   requested in Number 49.

21           So, Your Honor, if we could please have the report

22   detailing sales by customer name, by month and by product

23   offering, information detailing the cost to develop each

24   product, such as the Browserstack accessibility toolkit,

25   information detailing the amount of time, number of months,

                                                              30

1    number of labor hours, to develop their product offerings

2    included in the Browserstack accessibility toolkit, and the

3    information that relates to vendor disbursements relating to

4    the accessibility toolkit.

5             All of this information relates exactly to what

6    we've requested in Item 49, and it's far broader than the

7    arbitrarily narrowed and small set of information that

8    they've finally produced to us back on August 8th, the day

9    before expert disclosures were due.

10            If we're to try to settle, then we have to have

11   this information to speak constructively.  And if we don't

12   settle and we're going to have a trial very quickly, Deque

13   has a constitutional right before the jury to present this

14   evidence in order to show its prima facie case.  Damages are

15   an element, as you know, of our claims here, Your Honor.

16            THE COURT:  I'm not -- we're just trying to cabin

17   this in.  I mean, clearly there's a little bit of a -- you

18   know, of a -- I think sometimes what happens is you live

19   this case, you know this case, and sometimes things that

20   seem obvious to you are not necessarily obvious to somebody

21   that we're speaking to.  Let's take this one at a time, as I

22   said.

23            Okay.  What's the first one on your list, your

24   first of five?

25            MR. DUNN:  Monthly financial statements, as

                                                              31

1    detailed as possible, relating to the components of the

2    Browserstack accessibility toolkit.

3            THE COURT:  Is that what you have already

4    disclosed to them?

5            MS. CHANG:  Yes, Your Honor.  We've given the

6    monthly -- not monthly.  We've given the total revenues

7    for -- actually, it is broken down by month.  I apologize.

8    From first sale through when we updated it.  We produced

9    ones on August 8th and then updated it through the end of

10   August.

11           THE COURT:  Have you reviewed that production?

12           MR. DUNN:  We have reviewed that production, Your

13   Honor.

14           THE COURT:  Why is that production insufficient?

15           MR. DUNN:  Because it doesn't include the other

16   items that we've --

17           THE COURT:  Okay.  We're getting to the other

18   items.

19           You know, they gave you the monthly financials for

20   the toolkit; right?

21           MR. DUNN:  As I understand it, Your Honor.  They

22   produced that the day before expert disclosures were due.

23           THE COURT:  Okay.  I don't want to hear that

24   phrase again.  I get it.  Right.  You know, you're throwing

25   the ball over there.  That doesn't relieve you or your

                                                            32

1   client of seeking relief from the Court.  You don't just

2   let -- I'm just telling you, and this is something you're

3   going to need to know if you're going to litigate here.  You

4   don't just let deadlines pass and say, well, it was

5   unrealistic for us to respond.  I get motions every day.

6   Every single day I sign motions.  Hey, our deadline for this

7   is due tomorrow, we can't meet this deadline for this

8   reason, and I either grant it or I have a hearing

9   immediately or we figure it out.  But we don't just show up

10  at the end of September and say, hey, we missed a deadline

11  in the middle of August.  That just doesn't happen in this

12  district.  What happens is, district judges inform lawyers

13  that they don't have experts.  That's what happens here.

14          Now, if there are extenuating circumstances, we

15  will figure that out, and we will do our best to work

16  through them.  But, you know, the notion that it's their

17  responsibility -- if you didn't get information, then you

18  file a motion to compel.  What we do in this district is if

19  a motion is filed on Friday, we have a hearing within seven

20  days, and you get an answer then.

21          So I understand your frustration, but, you know,

22  it just -- every judge in this courthouse would be shaking

23  their head if somebody looked up and said we missed an

24  expert disclosure deadline by -- you know, by a month and a

25  half.  That just doesn't happen.  And then of course it

33

1    pushes everything else back.  It pushes the defense expert

2    notice back.  It pushes your rebuttal expert notice back.

3            So I don't want to get into this right now, you

4    know, who has -- you know, who didn't do what when.  What I

5    want to do now -- what I want to do now is figure out what

6    financials you have, what financials you don't have, what

7    financials you're entitled to, and I will order that.

8    That's it.  Okay.

9            So with respect to -- we'll go to the second

10   issue.  All right.  What was the second one on your list?

11           MR. DUNN:  A report detailing sales by customer by

12   name, month and product offering.

13           THE COURT:  Why do you need by name?  Why do they

14   need to give you who they -- why isn't it enough -- if the

15   question is damages, why isn't it enough just to know here's

16   what they sold?  Why do they need to disclose their other

17   customer base to you?

18           MR. DUNN:  If you would order them to give me

19   everything else, then I agree with you, names could be

20   redacted.

21           THE COURT:  Okay.  And why is that -- what -- it

22   sounds like that is already subsumed within the production

23   that they've already made.

24           MR. DUNN:  Your Honor, we're asking for it because

25   we understand it's not.  That's not what we have.

                                                              34

1             THE COURT:  Well, I don't know what's -- I can't

2    look through their files.  You know, there's a certification

3    requirement for every disclosure, right, for every -- that

4    counsel has worked with their client, that they have

5    reviewed this, that there has been a thorough search.

6             If what you're telling me is they haven't given

7    you all of the financials, you're just unhappy with the

8    production, or you think there's more, all I can do is tell

9    you, you know, they're saying we gave it to them.  You're

10   saying you think there's more.  Unless you can give me some

11   specific direction as to why, something specific to order,

12   then you have to take counsel's representation that this is

13   what they've provided.  They've provided their monthly

14   financials with respect to the toolkit.  What they've sold,

15   how much they've sold.  If presumably you've reviewed it, if

16   there's something in that production that you think is

17   insufficient, let me know.  I don't think it's necessary for

18   them to tell you to whom they've sold it.  I don't think

19   that's -- you know, I don't think that necessarily goes to

20   your damages or your delineated calculated damages.

21             So what's next on your list?

22             MR. DUNN:  Just before we leave that second one,

23   the second one was broader because it included by product

24   offering.  What they've told you here today is that they've

25   isolated, limited and narrowed it only to the one thing that

                                                              35

1    they're wanting to talk about here.  So the Court is not

2    going to order them to disclose other products that probably

3    include the stolen source code.

4             THE COURT:  Is there are a disagreement as to what

5    constitutes the accessibility toolkit?

6             MS. CHANG:  I was not aware of a disagreement.

7    There is a product we sell and refer to -- I think on our

8    website we call it web accessibility, and some of our

9    marketing documents we call it the web accessibility

10   toolkit.  It is a browser extension software product.  That

11   is how we keep track of it, that's how we track it, and

12   that's what we pulled the financial report for, that

13   product.

14            THE COURT:  Okay.  So why is it -- you know, we

15   have to -- the language has to mean the same thing.

16            Are you talking about something different when you

17   talk about the accessibility toolkit?

18            MR. DUNN:  I understand that it includes multiple

19   components and multiple items of code that they stole and/or

20   subsequently reverse engineered that permits and facilitates

21   website accessibility testing defined more broadly than what

22   I believe they are trying to narrow this to in what they

23   refer to as the accessibility toolkit.  I don't know how

24   more precisely to describe it right now for the Court.

25            THE COURT:  What you said makes -- admittedly, I'm

                                                              36

```
 1    not a tech person.  They sell a product, they identified how
 2    they sell their product.  It's clear from this exhibit how
 3    they sell their product.
 4              You think this product was used with information
 5    that was misappropriated from your client.  They've given
 6    you financials about this product.  This product contains
 7    multiple components.  Maybe your client's information was
 8    scattered throughout all of those components or one of those
 9    components or three of those components.  I don't know.  Or
10    none of them.  But if they've given you the financials with
11    respect to the entire component, I'm not sure what else
12    you're asking for -- or the entire product, I'm not sure
13    what else you're asking for.
14              MR. DUNN:  Okay.
15              THE COURT:  What else do you want me to order them
16    to do?
17              MR. DUNN:  The third item on our condensed list,
18    Your Honor, is information detailing the cost to develop
19    each product offering such as the Browserstack accessibility
20    toolkit.
21              THE COURT:  All right.  What about that?
22              MR. DUNN:  This relates --
23              MS. CHANG:  So, again, we want to limit it to just
24    the accessibility toolkit.  And in our report that we
25    generated, there is a tab for revenue per transaction,
```

1   revenue broken down by month, as well as a cost tab.  And in

2   that cost tab, we gave a figure for marketing costs, cost of

3   goods, cost of development, and there might have been one

4   other cost item line.

5          THE COURT:  So the cost of development is in

6   there?

7          MS. CHANG:  Yeah.

8          THE COURT:  So what you can say is with respect to

9   your accessibility toolkit, you have done a thorough search,

10  and you've provided information to them regarding your

11  investment and the development of that intellectual

12  property?

13         MS. CHANG:  Correct.

14         THE COURT:  I'm not sure what else you could ask

15  for.

16         MR. DUNN:  We would take that representation, Your

17  Honor, because their costs are minimal and our costs are

18  extreme, and so the delta will be a component of our

19  damages, I suppose.

20         THE COURT:  That's fine.  That's a trial issue,

21  that's not a discovery issue.

22         MR. DUNN:  The fourth item, Your Honor, on our

23  list is information detailing the amount of time, months,

24  labor hours, for example, to develop each product offering

25  included in the Browserstack accessibility toolkit.

                                                          38

```
 1              THE COURT:  Do you have that information?
 2              MS. CHANG:  So we have a development cost, and
 3    we -- I think we produced it with a remark or a note as to
 4    how that development cost was calculated.  I think we do it
 5    as an overall, all our workforce, their salary, and then we
 6    assign a percentage based on the percentage revenue for that
 7    product.  So that's how we internally track development
 8    cost.
 9              THE COURT:  So why is that not what -- what else
10    do you think RFP 49 requires?  What else are you requesting
11    from them that they didn't provide?
12              MR. DUNN:  I don't know what I don't know, Your
13    Honor.  And it's very difficult to attempt to ask for more
14    when they're the ones in possession of the information, not
15    me.
16              THE COURT:  Well, welcome to the world of
17    discovery.  Right.  I mean, that's every discovery issue.
18    Unless you've got a job there, I'm not sure how you would
19    know.  Right.  This is why we have lawyers who have ethical
20    responsibilities to work with their clients, to investigate,
21    to search, to object if they think it's appropriate and to
22    respond.
23              But, I mean, that's -- that's -- there's always a
24    little bit -- there's always an element of that in any
25    discovery issue; right?
```

1          MR. DUNN:  Your Honor, the last item on our list

2    is vendor disbursements related to their development of the

3    accessibility toolkit.  And I'll just say, they --

4          THE COURT:  When you say "vendor disbursements,"

5    which vendors and how are they involved in this?

6          MR. DUNN:  I would assume -- I don't know, Your

7    Honor, but perhaps they utilize external vendors to help

8    them further develop the information that they stole from

9    Deque, and I'm wondering about whether they've made those

10   disbursements, and, if so, how much.

11         THE COURT:  All right.  What about that?

12         MS. CHANG:  Your Honor, this vendor disbursement

13   this morning was the first time I heard about that request

14   specifically, so I cannot stand here and say I know what my

15   clients do with respect to that.

16         THE COURT:  What I will rule there is if there

17   were any -- if there were any third parties, if there were

18   any vendors that were used to develop in any manner the

19   accessibility toolkit, any payments to those vendors have to

20   be disclosed, and that should be pretty straightforward.

21         MS. CHANG:  All right.  We'll look into that, Your

22   Honor.

23         I did want to amend and clarify something I

24   recommended just to be accurate.  The allocation based on

25   percentage of revenue was for marketing costs.  I think we

                                                            40

1    did produce a salary line cost for the development team as

2    part of costs.

3            THE COURT:  I mean, I have to say, it does sound

4    like what they've given you is pretty typical about what a

5    plaintiff would receive with respect to financials in this

6    type of case.  I'm just not sure, you know, what else you're

7    expecting me to order them to do.

8            MR. DUNN:  What we're asking you to order them to

9    do is set forth more particularly in our moving papers, we

10   don't have what we need to discover and calculate with our

11   expert what our economic losses are.

12           THE COURT:  I don't understand that.  That's

13   not -- I don't understand why.  I mean, they have told you

14   what they -- they have told you -- they have told you what

15   they have sold the product for.  Right.  They've told you

16   the revenue that was generated by them selling the product.

17   They have given you information about how they developed the

18   product, their costs for developing the product.  They're

19   going to give you information as to whether or not they

20   contracted with any third-party vendors to help develop the

21   product.  So unless you have an expert that's going to come

22   in here and say I need these other four things, which I will

23   tell you, I don't know -- we talked about proportionality, I

24   don't know what else your damages are going to include.

25   Right.

                                                              41

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

1            What else are your damages -- if they

2    misappropriated money -- I'm sorry.  If they misappropriated

3    information, they developed a product, they went out and

4    sold that product, you know what their costs were to develop

5    that product, you know what their revenue was generated by

6    the sale of that product, what else do you need?  The

7    damages are not complicated.

8            MR. DUNN:  I understand what the Court is saying.

9            THE COURT:  All right.

10           MR. DUNN:  I'm just -- a settlement discussion

11   without the information that we've requested here is not

12   going to be constructive.

13           THE COURT:  You keep saying that, but I'm just

14   telling you, I don't get it.  I think what they've given you

15   is a lot.  I think what they've given you is enough.  And if

16   you can't have a settlement conference, that's fine.  I'm

17   trying to -- when I just tell you this, the settlement

18   conference -- in spending a day doing a settlement

19   conference is not for my benefit; it's for yours.  If you

20   think either party is going to be better served -- you do

21   what's in the best interest of your clients.

22           If you think you are better served to just

23   litigate these issues, I will give you rulings.  My ruling

24   right now is that the -- is that it sounds like, based on

25   the representations of counsel and my review of the

                                                              42

1    pleadings, is that they have really given you everything
2    that you're entitled to with respect -- with the exception
3    of the vendor issue, which I think just kind of was
4    crystalized this morning, and they're going to provide that
5    to you.
6            If you think I'm missing something, then you need
7    to file a motion with a lot more particularity than what
8    I've seen, that I think what they've given you, based on
9    this case, based on the nature of the allegations, is
10   exactly what you need to determine your damages if you can
11   prove liability.  So that's where that is.
12           You know, you don't have to -- and I didn't mean
13   to sort of compel anybody to a settlement conference.  If
14   you don't want to do it, don't do it, but you will get
15   rulings, and we can do it today.  But I'm just telling you,
16   if there's ever a wink and a nod from a judge, you want to
17   do a settlement conference, all of you.  If you don't, march
18   forward.
19           So I don't know what else -- you know, I do these
20   settlement conferences almost every day.  I don't know what
21   other information you really need to sit down and discuss
22   with me and so I can discuss with them, hey, here are
23   damages other than what they've given you.  I don't.  It
24   doesn't need to be broken down by -- I mean, they're willing
25   to take the position that it's this toolkit.  Everything in

43

```
 1   one.  If you think that there's information that's

 2   misappropriated beyond the toolkit, that doesn't sound like

 3   that's where your position is right now.

 4           So I'm comfortable with their representations and

 5   their submissions on the pleadings, that they have provided

 6   you with the discovery necessary to reasonably calculate

 7   your damages if you get there.

 8           So other than the third-party vendor issue, the

 9   motion to compel on this particular issue is denied.  All

10   right.

11           We'll go through this one more time.  Do you want

12   to have a settlement conference or not?

13           MS. CHANG:  Defendant Browserstack will be present

14   and available for a settlement conference.

15           THE COURT:  Do you want to have a settlement

16   conference?

17           MR. DUNN:  We will participate in good faith.

18           THE COURT:  That's not a yes, but I'll take it as

19   a yes because I'm an optimist.

20           All right.  Did you decide on Wednesday or

21   Thursday?

22           MS. CHANG:  We could be -- defendants could be

23   available for either.  Our slight preference would be

24   Thursday if there's no settlement and we do a follow-up

25   hearing on Friday, then we can just stay for the next day.
```

44

1              THE COURT:  All right.  Can you just bring up my

2      calendar for Thursday?

3              Are you all going to be traveling in that morning?

4              MS. CHANG:  We would travel the night beforehand.

5              THE COURT:  Okay.  How about we start at 10:30.  I

6      can do one thing in the morning first.

7              MS. CHANG:  Yeah.  The earlier the better for us

8      just because of the time zone difference, but if they're on

9      notice, we'll just make them stay up.  It's fine.

10             THE COURT:  That's fine.  Why don't we start at 9

11     then.  I may have to take one break -- a short break.  Why

12     don't we start at 9 on Thursday, and we'll go from there.

13     Okay.

14             MS. CHANG:  Thank you, Your Honor.

15             THE COURT:  All right.  And just please provide

16     the information with respect to the vendors as soon as you

17     can --

18             MS. CHANG:  Absolutely.

19             THE COURT:  -- so that they have that information

20     by Thursday.

21             MS. CHANG:  Will do.

22             THE COURT:  All right.  Thank you.

23                  (Proceedings adjourned.)

24

25

                                                              45

1          ----------------------------------

2    I certify that the foregoing is a true and accurate, to the

3    best of my ability, transcription of proceedings recorded by

4    electronic sound recording (FTR system).

5

6                        _Stephanie Austin_

7                        Stephanie M. Austin, RPR, CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              46