# EXHIBIT B

1

```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
                       ALEXANDRIA DIVISION


DEQUE SYSTEMS INC.,            .     Civil Action No. 1:24cv217
                              .
              Plaintiff,      .
                              .
     vs.                      .     Alexandria, Virginia
                              .     October 17, 2024
BROWSERSTACK, INC.; and       .     2:54 p.m.
BROWSERSTACK SOFTWARE PVT.    .
LTD.,                         .
                              .
              Defendants.     .
                              .
.  .  .  .  .  .  .  .  .  .  .


                  TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE WILLIAM E. FITZPATRICK
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


FOR THE PLAINTIFF:              STEPHEN P. DUNN, ESQ.
                               Bodman PLC
                               201 S. Division Street, Suite 400
                               Ann Arbor, MI 48104



FOR DEFENDANTS                 RYAN J. MARTON, ESQ.
   BROWSERSTACK, INC., and     CAROLYN CHANG, ESQ.
   BROWSERSTACK SOFTWARE       Marton Ribera Schumann &
   PVT. LTD.:                  CHANG LLP:
                               548 Market Street, Suite 36117
                               San Francisco, CA 94104



TRANSCRIBER:                   ANNELIESE J. THOMSON, RDR, CRR
                               (703)629-3845



                        (Pages 1 - 52)



(Proceedings recorded by FTR Gold electronic sound recording,
 transcript produced by computerized transcription.)
```

P R O C E E D I N G S

1

2          THE CLERK:  Deque Systems Inc. v. BrowserStack, Inc.,

3   et al., Case 1:24cv217.  Counsel, please note your appearances

4   for the record.

5          MR. DUNN:  Good afternoon, Your Honor.  May it please

6   the Court.  Stephen Dunn for plaintiff, Deque Systems Inc.

7          THE COURT:  All right, Mr. Dunn, good afternoon.

8          MR. DUNN:  Good afternoon, sir.

9          MR. MARTON:  Good afternoon.  Ryan Marton for

10  defendants BrowserStack, Inc., and BrowserStack Software Pvt.

11  Ltd.

12         THE COURT:  All right.  Good afternoon, Mr. Marton.

13         The -- we're here to resolve three pending motions:

14  docket entry 71, plaintiff's motion to compel production;

15  docket No. 74, plaintiff's motion for extension of deadlines;

16  and docket entry 104, defendants' motion to strike plaintiff's

17  rebuttal expert report.

18         Let's start -- let's just go in order, start with

19  docket entry 71, plaintiff's motion to compel.  I've read the

20  submissions.  Mr. Dunn, I'm happy to hear any additional

21  argument you have, although could you begin by again for the

22  record just concisely stating what it is that you are seeking

23  and what your authority is for your request?

24         MR. DUNN:  Yes, Your Honor, thank you.  I would at

25  this time like to narrow the scope of that motion to compel

3

1    discovery and only request information related to Request to

2    Produce No. 7, Request to Produce No. 9, and Request to Produce

3    No. 23.

4         Your Honor, it has been suggested on and off the

5    record several times in my appearances before the Court in this

6    matter that Deque's case is narrowly limited to only the

7    browser extension accessibility testing stand-alone product in

8    isolation.  It has been suggested to me, Your Honor, that our

9    First Amended Complaint only addresses that specific product in

10   isolation.

11        With great respect, Your Honor, that is false.  Our

12   complaint repeatedly addresses multiple products, plural, that

13   include functionalities and capabilities for website

14   accessibility testing.  Discovery has revealed that the

15   defendants have multiple products, plural, and multiple

16   packages or suites of products, plural, that include website

17   accessibility testing capabilities.

18        Specifically, for example, in our complaint at

19   paragraph No. 62 --

20        THE COURT:  I apologize, Mr. Dunn, if you could hold

21   on one second?  I've walked out without a copy of the

22   complaint.

23        You can proceed.  I just forgot, I left a copy of the

24   complaint -- your Second Amended Complaint on my desk.  So you

25   can proceed.

4

1          MR. DUNN:  Thank you, Your Honor.  For example, in

2    paragraph No. 62 of our First Amended Complaint, we've alleged,

3    "BrowserStack has also advertised the superiority of its

4    Accessibility Testing products by making false and/or

5    misleading statements."

6          As another example, in paragraph No. 105, we allege,

7    "By their conduct, as alleged throughout this First Amended

8    Complaint, in particular their misappropriation of the content,

9    design and text, including the procedures, processes and

10   methods of operation, of Deque's axe DevTools browser extension

11   for Chrome, Deque's Rules Help Pages and its Doc-Issue-Help

12   pages, the defendants have been unjustly enriched at the

13   expense of Deque . . .."

14         Those, Your Honor, are three separate products,

15   plural, that include multiple different functionalities and

16   capabilities that include or have embedded into them the secret

17   sauce software code that is not open source, it is closed

18   source, and that the defendants licensed from Deque pursuant to

19   the terms of a written license agreement that obviously the

20   defendants breached.

21         The defendants stole Deque's secret code, took that

22   secret code, reverse-engineered it in violation of the terms of

23   the written license agreement, and then embedded the functional

24   capabilities of that secret copyrighted code into multiple

25   different accessibility testing products, product suites,

1    product packages, and/or product bundles.

2         And so, Your Honor, this is not a case of -- or that

3    focuses on only the website accessibility testing toolkit

4    product by itself in isolation.  It's much bigger; it's much

5    broader; it's much more serious.

6         Looking at Request to Produce No. 7, No. 9, and

7    No. 23 only, sir, I ask the Court to enter an order compelling

8    the defendants to produce documents that are sought in those

9    specific requests to produce only at this time, and I will not

10   move forward or request that the Court enter an order

11   compelling discovery on the other requests to produce that are

12   at issue in this particular motion to compel.

13        Request to Produce No. 7 asks for documents related

14   to the requirements, designs or approvals for development of

15   the accessibility toolkit.  That's an accessibility testing

16   product or product suite.

17        Mr. Marton, counsel for BrowserStack, assured my

18   colleagues in a meet-and-confer that these types of planning

19   documents did not exist.  However, Your Honor, deposition

20   testimony of three BrowserStack witnesses provided evidence

21   establishing that these documents do, in fact, exist, but

22   BrowserStack has failed and refused to produce them to us in

23   this case, and they are obviously relevant.  I'll give you

24   examples.

25        THE COURT:  Let's break this down a little bit

1   because if I recall, Exhibit A, a chart that defendants had

2   presented, sort of goes through this almost line by line,

3   right?  And I think essentially there's a good portion of

4   defendants' argument that this has already been provided.  Is

5   that correct?

6           MR. DUNN:  Yeah, well --

7           THE COURT:  I'm sorry, but before we get there -- I'm

8   just saying before we get there, let me hear from defendants.

9   I understand your position with respect to paragraph 105 and

10  paragraph 62.  Right now what I want to hear is, Mr. Dunn, is I

11  want to hear from Mr. Marton, and let's go over paragraph 105.

12          MR. MARTON:  Yeah.

13          THE COURT:  Because I think, you know, clearly a

14  threshold issue is whether or not -- is the scope of the

15  complaint, the operative complaint.

16          MR. MARTON:  Sure.

17          THE COURT:  So tell me in 105, where he refers to

18  Deque's axe DevTools, broader extension for Chrome, Deque's

19  Rules Help Pages, and its Doc-Issue-Help pages, is that part

20  and parcel of the accessibility toolkit, or are those other

21  products?

22          I want to hear from Mr. Marton.

23          MR. MARTON:  I would really appreciate the

24  opportunity.  Thank you, Your Honor.  I think the keyword that

25  was in front of every single product you referenced there was

1    "Deque."  That's the plaintiff's products.  These are not

2    accused BrowserStack products.  These are the plaintiff's

3    products.

4            I think the relevant --

5            THE COURT:  Mr. Dunn, I'll hear from you again in a

6    minute.  I'll hear from you again in a minute, but lawyers in

7    this courthouse, and I'm telling you this as a free piece of

8    legal advice before you appear before Judge Trenga, lawyers in

9    this courthouse stay stoic.  It doesn't matter if they like the

10   ruling, if they don't like the ruling.  Lawyers in this

11   courthouse don't make faces, they don't flounce, and they don't

12   do anything else.  They stay stoic.

13           And for those of us on the fifth floor and below, we

14   give that advice to people before they go to the sixth floor

15   and above.  So let me hear from Mr. Marton, and then I'm happy

16   to hear from you again, Mr. Dunn.

17           Okay.

18           MR. MARTON:  So I think -- so specifically referring

19   to paragraph 105, that doesn't reference any particular accused

20   product.  Those are Deque's products.  So I think if we want to

21   look at what's at issue in this case, we can start with the

22   First Amended Complaint, and I think paragraph 40 is

23   instructive, and that's where we start talking about the

24   defendants' products.

25           And here it says, "BrowserStack markets and sells, at

1    least within the United States, a browser extension for Google

2    Chrome and Microsoft Edge 'for testing the accessibility of

3    your website or web application.'  (Hereinafter referred to as

4    the 'BrowserStack Accessibility Toolkit.')"

5            So what we're talking about here is a browser

6    extension for Chrome and Microsoft Edge.  That's the

7    BrowserStack accessibility toolkit as defined by the plaintiff.

8            And then I think if you look at the definitions in

9    the document requests at issue, it also refers to the

10   BrowserStack accessibility toolkit.  So they're not even asking

11   for documents about products beyond this stand-alone browser

12   extension.  It's something that can be downloaded from the

13   Google Chrome store and added to your browser.  It is a browser

14   extension.  It is a product sold by itself.  That is the scope

15   of this case.  I appreciate that Deque has other products of

16   its own that it mentions within the complaint, but it doesn't

17   broaden the scope of the discovery at issue here.

18           One other point I'd like to make is while I

19   appreciate plaintiff willing to narrow its motion to compel to

20   RFP 7, 9, and 23, that actually doesn't narrow the motion to

21   compel.  RFP 9 was not part of the motion to compel, so it

22   actually, it broadens it in a way that we didn't anticipate.

23           THE COURT:  All right.  All right, thank you.

24           MR. MARTON:  Thank you.

25           THE COURT:  Mr. Dunn, let's go back to 105.  105

1   reads, "By their conduct, as alleged throughout this First

2   Amended Complaint, in particular their misappropriation of the

3   content, design and text, including the procedures, processes,

4   methods of operation, of Deque's axe DevTools browser extension

5   for Chrome, Deque's Rules Help Pages, and its Doc-Issue-Help

6   pages" -- Deque's property, Deque's products --

7          MR. DUNN:  Yes, Your Honor.  The --

8          THE COURT:  -- "the Defendants have . . . unjustly

9   enriched" -- "have been unjustly enriched at the expense of

10   Deque by using Deque's content, design and text, including the

11   procedures, processes and methods of operation, to create and

12   sell website accessibility testing services and have profited

13   therefrom" --

14          MR. DUNN:  Yes, Your Honor.

15          THE COURT.  -- "while Deque has received no benefit,

16   income or revenue from use of its content . . .."

17         How does that take this beyond the accessibility

18   toolkit?  I don't understand your point.

19          MR. DUNN:  Your Honor, it says we have multiple

20   products.  They misappropriated those products.  They

21   misappropriated the content, design and text, including the

22   procedures, processes, and methods of operation, when stealing

23   the code, and then included it in their own multiple products.

24         As I started to articulate a few minutes ago, Your

25   Honor, deposition testimony of three BrowserStack witnesses has

10

1   established, Your Honor, the basis for the fact that this case

2   is much broader than what BrowserStack is attempting to limit

3   it to be.

4           In addition to paragraph 105, Your Honor, I --

5           THE COURT:  Are you talking about products that go

6   beyond, quote -- this is your paragraph -- "accessibility

7   testing services"?

8           MR. DUNN:  That's plural, Your Honor, services, and

9   services are included in multiple products, Your Honor.  So

10  beyond paragraph 105, as I mentioned before, we also have a

11  reference to multiple products, plural, in paragraph No. 62 of

12  the First Amended Complaint and in paragraph No. 66 of the

13  First Amended Complaint, which referred to BrowserStack's

14  products, plural.

15          But, Your Honor, as I started to mention earlier,

16  multiple BrowserStack witnesses with reference to RFP No. 7,

17  for example, Lakshay Arora of BrowserStack, testified that he

18  presented plans that, quote, would include the detail of what

19  all items we would ship and how much effort it would take us

20  broadly.  These are referred to internally at BrowserStack,

21  Your Honor, as "story points," which is a way they measured --

22          THE COURT:  For my purposes, isn't this really only

23  important for proportionality analysis?  I mean, that's really

24  what this is.  I mean, this is still a discovery issue, so for

25  purposes of today, the proportionality analysis is tied to your

11

1    complaint, right?  That's where it is.

2          I'm not making any ruling with respect to the

3    admissibility of evidence.  I'm not making any ruling with

4    respect to anything beyond what my little piece of the world is

5    right now, which is determining the proportionality of your

6    discovery requests, right?  Or my -- or is it beyond that in

7    your view?

8          MR. DUNN:  I'm not sure exactly how to answer the

9    Court's question except to say this:  This case -- and I

10   represent the plaintiff, not Mr. Marton.  This case is about

11   far more than only the stand-alone browser extension --

12         THE COURT:  But this issue is about a motion to

13   compel, right?  This issue is about a motion to compel,

14   specific discovery issues, right?

15         I'm not here to decide the merits of the case.  I'm

16   here to decide the merits of the motion, and if there is a --

17   if there is, you know, if you are given -- if you have made a

18   proper discovery request and they have not responded to that

19   discovery request and that discovery request is relevant and

20   proportionate, I will order them to respond, but the -- but it

21   has to be proportionate to the issues raised in your

22   complaint.

23         MR. DUNN:  Your Honor, our damages exceed $30

24   million, and so certainly asking them to produce requirements,

25   designs or proposals for the accessibility toolkit products

1   would be proportionate, in my view, respectfully.

2          Let's propose for a moment that RFP No. 7 is only

3   limited to the stand-alone accessibility toolkit product.  I

4   disagree with that, but let's, let's entertain that idea for a

5   moment.  They've produced no documents at all responsive to

6   Request to Produce No. 7 even only limited to the accessibility

7   toolkit product, even though their witnesses testified at

8   deposition about, quote-unquote, story points, which is what

9   these are referred to internally at BrowserStack, story points,

10  which is a way that BrowserStack measured the complexity and

11  effort it would take to produce certain features for

12  accessibility testing.

13         We have no documents at all, even if it were narrowly

14  tailored to accessibility toolkit as a stand-alone product,

15  which I disagree this case is that narrowly construed, no

16  documents.  Lakshay Arora testified about story points.  Shukla

17  Arpan (sic) testified that Apury Jain sent him back-end

18  requirements documents about accessibility testing.

19         We have --

20         THE COURT:  All right.  So let's be very specific.

21  What is it that you are asking -- if you were to craft an

22  order, what specifically are you asking me to compel them to

23  turn over?

24         MR. DUNN:  Documents related to the requirements,

25  designs or proposals for development of accessibility testing

1   products.

2          THE COURT:  Now, my understanding from their

3   response -- all right, you may have a seat for a moment.

4          Mr. Marton, my understanding is your position is you

5   have turned those documents over.

6          MR. MARTON:  I think the --

7          THE COURT:  With respect to the accessibility

8   toolkit.

9          MR. MARTON:  So the RFP is directed to the

10  accessibility toolkit, so aside from the fact -- whatever the

11  plaintiff says, if this case is bigger than the accessibility

12  toolkit, it doesn't really matter for this issue.  For this

13  issue, we're dealing with RFP 7, which is directed to the

14  accessibility toolkit.

15         We have produced -- we've produced our source code

16  and source code repository, which includes all revisions, all

17  developer notes, everything about the accessibility toolkit

18  that is critical.  It's the sort of heart of the development of

19  this product, which the plaintiff hasn't looked at.

20         We also went through and produced any development

21  documents that related to the alleged copying, and so there

22  were -- despite the plaintiff's assertion that we didn't

23  produce any documents, we did produce planning documents,

24  product specifications, anything that related to the specific

25  allegations of copying, provided.

14

1           And we did search through email.  We did search

2    through Slack for communications related to that copying.  To

3    the extent any were found, they were produced.

4           So yes.

5           THE COURT:  When was that production made?

6           MR. MARTON:  Most of it -- and the dates are a little

7    hard for me, but I know since July 3, we made the source code

8    production.  August 8, we made a substantial production that

9    included this sort of key development documents.  And when I

10   say the key development documents, these are documents that are

11   not great for us.  These, you know, this is -- if you were to

12   hand over the worst document, the most relevant documents,

13   those were in the first tranche, document No. 1 in this case.

14   It's the key of this case.  That was produced on the 8th.

15           I don't know if additional documents like this were

16   produced since then because I haven't followed the dates of

17   production.  I have reviewed every document produced.  I don't

18   know the exact dates of production.

19           THE COURT:  All right.  Mr. Dunn, have you reviewed

20   everything that Mr. Marton has disclosed to you or made

21   available to you?

22           MR. DUNN:  Your Honor, what he --

23           THE COURT:  I want an answer -- answer the question.

24   Have you reviewed everything that defendants have produced --

25   that they say that they have produced in response to No. 7?

15

```
 1              MR. DUNN:  Yes, Your Honor, but we have not gone to
 2      visit -- the source code is at a location that we need to go
 3      and visit, and we will do that, but what he --
 4              THE COURT:  Well, then how do you know -- let me ask
 5      you this:  It's a very simple question.  And you're going to
 6      have to stop shaking your head, and you're going to have to
 7      listen to what -- I understand you don't like that I keep
 8      interrupting you, but this is my ruling, and I have to make
 9      sure I understand this, okay?  So -- and I'll give you a chance
10      before we leave today to say anything you want or put anything
11      else you want on the record.
12              Here's my question, and perhaps it's a simple
13      question, and perhaps it's an uninformed question, but you tell
14      me, how is it that you don't know what they have -- or how is
15      it that you can assert that they haven't given you something if
16      you haven't reviewed what they have provided to you?
17              MR. DUNN:  Your Honor, we have reviewed everything
18      they've provided to us.  We haven't gone to visit the source
19      code and look at the source code.  The source --
20              THE COURT:  Why not?
21              MR. DUNN:  Your Honor, the source code --
22              THE COURT:  If they made it -- my recollection is
23      they made it available to you back in May or June.
24              Is that correct?
25              MR. MARTON:  July 3.
```

16

 1          THE COURT:  All right, July 3.  This is now October.

 2   Why through the month of July, August, September, and into

 3   October have you not gone to review that material?

 4          MR. DUNN:  Your Honor, it's, it's thousands and

 5   thousands and thousands of lines of code that would take years

 6   to review, but if I may -- if I may also inform the Court,

 7   respectfully, of the following, thousands of lines of source

 8   code is not story points, research engineering solutions, and

 9   technical specification documents that BrowserStack witnesses

10   testified they have.

11          And I have looked at everything that they have

12   produced to us.  It's not much, frankly.  It's not the

13   documents that are responsive to RFP No. --

14          THE COURT:  All right.  Mr. Marton, do you have those

15   documents, story point -- the documents that Mr. Dunn just

16   stated?

17          MR. MARTON:  I'm not sure.

18          THE COURT:  Do you have those documents, and were

19   those documents not turned over?

20          MR. MARTON:  I don't know what the story points

21   documents were.  We did produce the design and requirements

22   documents proposals that relate to this specifically accused

23   functionality, and we provided -- honestly, if you want to look

24   at the scope of copying in this case, to the extent there is

25   any, you look at the source code, which shows everything that

1    ever happened.

2          So these additional documents, while probably not

3    relevant, to the extent they implicate any of the alleged

4    copied functionality or features, we provided that.  Did we go

5    and provide every communication related to development?  No, we

6    did not.

7          MR. DUNN:  And that's all we are looking for here,

8    Your Honor:  what the witnesses testified to about their story

9    points, research engineering solutions, and technical

10   specification documents.  This is what was going on inside

11   BrowserStack, sir.

12         THE COURT:  Story points?  What were the other two?

13         MR. DUNN:  Story points, research engineering

14   solution documents, and technical specification documents.

15   Communications inside BrowserStack about their work to develop

16   accessibility testing, that helps us fill in the timeline of

17   events that happened here because the parties entered into a

18   written license agreement and then at a point thereafter,

19   BrowserStack copied the subject code and --

20         THE COURT:  All right.  Mr. Marton, do those

21   documents exist?  I mean, you know, presumably those documents

22   have technical definitions.

23         MR. MARTON:  Story points, requests for proposal --

24   I'm sure there are additional design documents.  However, what

25   the plaintiff is asking for is every communication related to

18

1   design and every document related to design and development,

2   and I think with the proportionality analysis for this, this is

3   actually a simple case, and we provided our source code.  We've

4   provided the design and development documents that are

5   implicated by the allegations of copying, and searching through

6   and producing every single other document related to

7   development of actually quite a large product where only a

8   small portion is implicated, I mean, it would involve reviewing

9   millions and millions of documents.  It would be time

10  consuming, and it would be not productive.

11          What is productive is the source code here, and,

12  frankly, that the plaintiff has not looked at it is somewhat

13  telling.  I mean, I don't think any other additional documents

14  are needed, and I'm not sure I believe that the plaintiff

15  believes other documents are needed.

16          If after review of the source code the plaintiff

17  says, hey, there's an issue here that we didn't see before, we

18  need more documents, we should consider that then, but as of

19  now --

20          THE COURT:  Mr. Dunn, you know the source code that

21  was taken, correct, or that you allege was taken?

22          MR. DUNN:  Yes, sir.

23          THE COURT:  All right.  So why isn't it sufficient to

24  order these three categories:  story points, research

25  engineering solutions, and technical specifications documents,

1    that pertain to the source code that was taken?  Why do you

2    need it beyond that?  Why is it proportionate beyond that?

3              MR. DUNN:  If we added communications at BrowserStack

4    concerning development of accessibility testing, I would agree,

5    sir.

6              THE COURT:  Why wouldn't everything, including

7    communications, be tied to the specific source code?

8              MR. DUNN:  Because the source code relates to and it

9    enables accessibility testing, that that's what they were

10   communicating about and that's what these documents relate to,

11   sir.  So if we get their story boards, research engineering

12   solutions, technical specification documents, and their

13   internal communications about accessibility testing during the

14   relevant time period --

15             THE COURT:  What is the relevant time period?

16             MR. DUNN:  The parties first entered into their

17   license agreement in around July of 2021.

18             THE COURT:  And when does the relevant time period

19   end?

20             MR. DUNN:  The infringing activities continue to

21   occur to this day, Your Honor.

22             THE COURT:  So, Mr. Marton, tell me again why -- and

23   I -- and I think that the nub, as I understand it, of

24   Mr. Dunn's argument is if the source code was misappropriated,

25   they need to know how it was subsequently used.

20

1          MR. DUNN:  Yeah.

2          THE COURT:  Right?  And whether it was the second

3    generation or the third generation or the fourth generation,

4    you know, what did it grow into from the original fact, right?

5          MR. DUNN:  Yep.

6          THE COURT:  So why, why is not some level of

7    discovery regarding that not appropriate?

8          MR. MARTON:  We have given the exact discovery on

9    that issue, and that is the source code repository.  So the

10   source code repository is more than just the current day source

11   code.  It is what's called the GitHub repository.  It shows

12   every edit and comments from developers, every version from day

13   to day.  Anytime a change is made to that source code, it's

14   logged and dated.

15          So to the extent they want to pinpoint the date that

16   something was allegedly copied, they can do it with our source

17   code repository.  They can see who did it, they can see when

18   they did it, and they can see when it was changed.  That's all

19   there.

20          These additional documents that they're asking for

21   will not shed additional light on that.  In fact, they'll only

22   be confusing and --

23          THE COURT:  Well, let me ask you this, Mr. Dunn:

24   Does it matter?  Why does it matter?  So in other words, if --

25   and maybe I'm painting with a little bit too broad of a brush,

21

1    and tell me if I am, right? -- if, as I think is the case, this

2    complaint cabins in your claim for accessibility -- for the

3    accessibility toolkit -- I know you disagree with that, I

4    understand that, I appreciate that, but that's my reading of

5    the complaint.  That's my view of the discovery.

6         In fact, you know, I recall that, that that was

7    certainly the understanding of at least the defense at the last

8    oral argument that we had, right, when I asked the question,

9    right, is there a disagreement about what constitutes the

10   accessibility toolkit and the scope of this, and that appeared

11   to be the first time that this was really an issue.  Because

12   I've gone back, I've looked at the pleadings, I've looked at

13   your submissions, and I don't really see it.  I just don't see

14   it.  I don't see it pled.  I don't see it argued.  We can agree

15   to disagree on that point.

16        But if that's the case, why does this matter?  If the

17   defense are taking the position that the accessibility toolkit

18   itself, if they concede in some form or fashion -- and I'm not

19   trying to put words in your mouth, but my -- and maybe I'm

20   wrong -- but that yes, there was some code that was temporarily

21   inserted in there, right, what does the rest of it matter,

22   right?  Why does it matter if -- how much it was used to create

23   the accessibility toolkit?

24        MR. DUNN:  That code took decades for Deque to

25   develop and tens of millions of dollars of development costs.

1    That code is the DNA of Deque.  That code is the corporate

2    lifeblood of the entire organization, Your Honor.

3             THE COURT:  I got it.

4             MR. DUNN:  That code cannot just be taken, plugged

5    in, reverse-engineered, all in violation of the written license

6    agreement, and then they come in and say, oh, it's just this

7    narrow, little case, plaintiff.

8             Deque does not --

9             THE COURT:  Well, in fact, they can, and if that's

10   what the facts bear out, that's what it is.  Just because there

11   was a -- just because -- and let's assume for the sake of

12   argument, I'm not making any findings or certainly any rulings,

13   but if there was a misappropriation of the code and even if

14   that code was incredibly valuable, if it was -- if it was only

15   used in a very limited way and they -- then what does the rest

16   of it have to do with the development of -- what does the rest

17   of the development have to do with your theory?

18            MR. DUNN:  Your Honor, their witnesses have testified

19   at deposition that the code enables multiple products that are

20   included in a package of products available right now on their

21   website for purchase as a suite or a bundle that include

22   website accessibility testing capabilities.

23            And so, Your Honor, this is absolutely relevant and

24   it's absolutely proportionate because Deque's damages exceed

25   $30 million in this case, including for that development cost

1    that took decades to build here.

2           All we're talking about is -- and by the way, to

3    respond to something Mr. Marton said a moment ago, the

4    testimony in this case has indicated that the communications

5    like the ones I'm talking about including the, like, on this

6    GitHub which counsel just referenced a moment ago, are not

7    stored in the code.  The communications and the evidence that

8    I'm seeking an order compelling them to produce right now from

9    Your Honor are not stored in the code.  That was testimony from

10   Deque's witnesses, including Shukla Arpan (sic).

11          And so if it is in the code, then point me to where

12   it is.  If it's not in the code, which your own witness

13   testified it isn't --

14          THE COURT:  Well, communications, I assume you're

15   talking about emails, documents, memos, text messages that deal

16   with, specifically with this code.

17          MR. DUNN:  Internal chats, yes, including on Slack,

18   yes, Your Honor, you've got it, for that period of time that I

19   mentioned before.  So story points, the research engineering

20   solutions, the technical specification documents, and the

21   communications.

22          And if, if we have an order for those items, then

23   that's all I'm asking the Court for today, Your Honor.

24          THE COURT:  And your argument is ordering those

25   things -- let me ask you this:  Do you have any objection to

1    ordering those things relevant to the specific code versus

2    ordering those three categories regarding the entire

3    accessibility toolkit?

4            MR. MARTON:  We have already produced those things to

5    the extent they relate to the specifically alleged copied

6    portions of the toolkit.

7            THE COURT:  Okay.

8            MR. MARTON:  To the --

9            THE COURT:  Of the entire toolkit.

10           MR. MARTON:  The entire toolkit.

11           So they have specific allegations in an interrogatory

12   saying this part of the toolkit is copied, this part of the

13   toolkit is copied, this part of the toolkit is copied, and we

14   provided everything we could find, including communications

15   related to those portions of allegedly copied code.

16           And to the extent -- and I hear it over and over, and

17   I've heard it throughout this case that they need to understand

18   the scope of copying beyond that, and I actually agree with

19   that.  I actually -- I've been a plaintiff before.  I think

20   they get to understand that, and the place to look for that is

21   in our source code revision history.  To the extent they want

22   to look at that and find all the copying, that's the place to

23   go.  That is the centerpiece of this case.

24           It's like saying a book I wrote copied a book that

25   Ms. Chang wrote.  Well, you'd want to look at the book I wrote

```
 1    to evaluate whether or not I copied.  That's what they should

 2    be doing.  Look at the book.  That's the source code.

 3            And to the extent they've already identified stuff

 4    that they allege was copied -- and we certainly don't concede

 5    that there was copying of any code just to be clear -- but to

 6    the extent they have specifically identified stuff they say was

 7    copied, we provided development documents related to that,

 8    communications related to that, design documents related to

 9    that, and, of course, the source code related to that.

10            THE COURT:  Did you hold anything back with respect

11    to the accessibility tool kit?  Did you hold anything back

12    based on privilege?  Did you hold anything back that would

13    otherwise be responsive?

14            MR. MARTON:  Not based on privilege.  We did not

15    produce -- and I've said this before -- we did not produce

16    every single communication and design document related to the

17    toolkit.  It's a huge product that involves a screen reader, a

18    thing called work flow analyzer.  These are things not

19    implicated at all, and we didn't produce design documents for

20    that, communications related to that.

21            What we did provide is communication and documents

22    related to the specific portions of this assisted task, which

23    is implicated in their complaint --

24            THE COURT:  Right.

25            MR. MARTON:  -- and in their interrogatory responses.
```

1            For us to go back and pull every communication and

2      every document related to design and development of the overall

3      broad product, it would involve review of upwards of 5 million

4      documents.  It would take my firm, everyone in my firm a couple

5      weeks to do, and it would cost our client hundreds of thousands

6      of dollars, and it would yield nothing.

7            THE COURT:  Okay.  I understand.  Thank you.

8            MR. MARTON:  Thank you.

9            THE COURT:  All right.  Anything else, Mr. Dunn?

10            MR. DUNN:  No, Your Honor.  Thank you.  All I'm

11      asking for, as you well know, the plans, the story points, the

12      engineering solution documents, the technical specification

13      documents, and the communications, and that information is not

14      in the code.  Thank you, Your Honor.

15            THE COURT:  All right.  I'm going to hear argument on

16      the other matters, and then I'll come back and rule on all of

17      them.  Let's move to the motion to extend pretrial deadlines.

18      The pretrial deadline that is at issue is the plaintiff's

19      deadline to designate their experts, which set by court order

20      was August 9.

21            All right, Mr. Dunn?

22            MR. DUNN:  We withdraw that motion, Your Honor.

23            THE COURT:  You withdraw that motion?

24            MR. DUNN:  Yes, Your Honor.  Subject to our ability

25      to call Mr. Kahaian as a rebuttal witness concerning our

27

1    damages in this case.

2              THE COURT:  Well, all right.  Then I will -- given

3    the fact that that motion is withdrawn, I'll deny it as moot.

4              Let's move to the third motion, docket No. 104,

5    defendants' motion to strike plaintiff's expert rebuttal

6    report.  All right, Mr. Marton, it's your motion.  I'll hear

7    any additional argument you want to make.

8              MR. MARTON:  My colleague, Ms. Chang, will argue the

9    motion.

10             THE COURT:  All right.

11             MS. CHANG:  Thank you, Your Honor.  Carolyn Chang for

12   defendants.  I think most of our position is set forth in our

13   papers, and I just want to highlight, you know, a way to think

14   about this.

15             I think it's a very fundamental and kind of

16   straightforward understanding in this -- in this court and

17   generally in federal court on the expert disclosure schedule,

18   right?  We have the party, in this case the plaintiff with the

19   burden of proof that goes first, and then we give the party

20   that doesn't have the burden of proof an opportunity to respond

21   to that and then put forth their own affirmative position, and

22   then that is why we allow a rebuttal, because presumably the

23   person who had the burden of proof didn't have an opportunity

24   to yet address what the defendant would say in the second

25   report.

28

1          So what we have here is a situation where a rebuttal

2     report should really be very narrowly tailored to things that a

3     plaintiff could not have raised in the initial report and is

4     only responding to what a defendant's expert brings up.

5          We have a situation here where we're using the

6     rebuttal report deadline as a device to sneak in what should

7     have been the initial report, and that's what we're asking to

8     be stricken here.  So that, that is the first basis for our

9     request to strike, the fact that it just does not follow and it

10    exceeds the scope of what is a proper rebuttal.

11         THE COURT:  If they don't -- if they don't have an

12    expert and they have the burden, so they're not able to call an

13    expert with respect to damages, are you going to call an

14    expert?

15         MS. CHANG:  So that would depend, Your Honor, on what

16    is actually presented through lay testimony on their

17    case-in-chief.  I imagine if what happens at trial is they go

18    in and they present their case-in-chief and they rest and

19    there's never an advancement or a calculation of damages or a

20    request for damages, we may very well move for a directed

21    verdict at that time, but that, that depends (inaudible) the

22    play out.

23         But we're in a situation here where I have to, you

24    know, be able to plan my case and understand what my expert

25    needs to do based on what has been disclosed within the scope

1    of this case during the discovery period.

2              THE COURT:  Why isn't this more really as much of an

3    evidentiary issue that, that Judge -- you know, given that

4    posture, why should I rule on this now, as opposed to just

5    if -- if the issue really is dependent upon what evidentiary

6    rulings Judge Trenga makes in terms of the boundaries of any

7    fact witness, so that you have to then make a decision as to

8    whether or not you want to call your expert witness, right, and

9    I understand that's a trial tactical decision, you don't know

10   what that's going to be until, until you get there, right, but

11   why should I rule on this now, as opposed to just wait and see

12   how the trial plays out, and Judge Trenga at that point will be

13   in the best position to determine whether or not any true

14   rebuttal and the scope of that rebuttal is proper?

15             MS. CHANG:  I think there is -- the primary reason, I

16   would say, is because this opens up discovery which is closed

17   now, right?  We have now an expert report that was served to us

18   three days before the close of discovery which we believe

19   advances an affirmative case-in-chief on damages that our --

20   we've never been able to review.  It relies on conversations

21   with Deque's CE O that was had on October 7.  We were served

22   with this report toward the end of the day on October 8.  We --

23             THE COURT:  You might be totally right, and I think

24   you -- I think there is a logic to your argument, I understand,

25   that, that this goes -- even though the rules do permit new

1    evidence, new information, and a rebuttal report, that this

2    seems to go beyond a true rebuttal and to try to get in their

3    affirmative damages calculation; I understand that.

4           But isn't Judge Trenga perhaps in at least as good if

5    not better position once the trial is underway to determine the

6    scope of -- or where that line is?

7           MS. CHANG:  No, because we also need our expert to be

8    able to respond to that.  So we have to do -- reopen discovery

9    to allow him to do a --

10          THE COURT:  Reopen discovery I don't believe is on

11   the table.

12          MS. CHANG:  Right.  So that's why I think that

13   decision has to be made now, right?  I need to know for summary

14   judgment what can and cannot be said.  I think if we delay this

15   and the decision is to allow this report, we never have the

16   opportunity to do that.

17          I think the secondary reason is this is not just an

18   issue of the timing of expert disclosure.  I think there is a

19   grounds to not allow this because of failure to disclosure

20   damages in your initial disclosure.  So regardless of the

21   timing of whether this is proper rebuttal, this should not be

22   allowed either.

23          Perhaps that is also an issue for Judge Trenga, but I

24   think the real issue is we have summary judgment coming up on

25   October 28.  These are important issues that we need to know

31

1    because that sort of defines the issues and the scope of what

2    is allowable evidence for consideration and what we're going to

3    move on, so this is about the efficient progress.

4            And honestly, if we're going to allow the Kahaian

5    report, I'm going to have to move to allow my expert to file

6    what should have been in his initial report because he should

7    have had an opportunity to respond to all of that in his

8    initial report, as well as we have not had an opportunity to

9    serve a subpoena and notice to depose this expert that only

10   served a report three days before the close of discovery.

11           THE COURT:  So this is a 30,000-foot summary, right,

12   which is, which is for what it's worth.  As I recall, the

13   substance of your expert's report is that you cannot calculate

14   damages to any reasonable degree of specificity or certainty

15   based on the information that you were provided in discovery.

16   That's really kind of the heart and soul of what your expert is

17   saying; is that generally correct?

18           MS. CHANG:  So as to certain theories for damages.

19   So, for example, actual harm to plaintiffs in sort of the lost

20   profits or other kind of harm they've -- directly, so the

21   actual damages, our expert did an analysis that said, well,

22   first of all, I don't know what they're claiming as their

23   actual damages.  That has never been disclosed expert testimony

24   or in discovery.  But based on the evidence I do see, I don't

25   see enough to make a causal connection, so I can't make a -- I

32

1    don't believe there's evidence to support that at this time.

2           But then he otherwise did say, look, the limits of

3    what could possibly be recovered, for example, under the

4    copyright provision that allows disgorgement of the defendants'

5    profits, he had data for that.  So he said, look, the total

6    revenue during the relevant time period is X many dollars,

7    that's going to be a ceiling for that kind of recovery.

8           THE COURT:  Right.

9           MS. CHANG:  And then he also did an analysis, but,

10   you know, look, there was some engineering costs to remove the

11   complaint about content, so I could put a value on that.

12          Those -- that was the scope of what he testified to.

13   If there had been an affirmative damages theory advanced by

14   plaintiffs with a calculation or at least a methodology,

15   something more, articulated more specifically than we are going

16   to be seeking damages allowable under the law, including lost

17   profits, revenue, and things like that, he would have addressed

18   that, but that wasn't available to him at the time.

19          THE COURT:  So is it your position generally that if

20   you were trying to draw lines or draw boundaries here, that you

21   don't object if their rebuttal expert were to testify and

22   challenge sort of the internal -- what they would view as the

23   internal deficiencies of your expert's report, but the line

24   that you draw is, but they should not be permitted to then

25   advance it and say:  And here's how the damages should be

1    calculated.

2              MS. CHANG:  That is correct, Your Honor.  So that is

3    what we noted in our moving papers in the footnotes.  I think

4    footnote 3 says these are the paragraphs that we believe would

5    be the scope of a proper rebuttal, and I think in our

6    conclusory paragraph, we have a footnote that says these are

7    the paragraphs we think should be stricken, because it goes, as

8    Your Honor has described, beyond just criticizing the evidence

9    and rationale used by Mr. Benoit but goes so far as to say that

10   was incorrect, you should have done it this way, and proposes a

11   completely independent, affirmative methodology that's

12   unrelated to anything Mr. Benoit discussed.

13             THE COURT:  Okay.  All right.  Mr. Dunn, so then why,

14   why should this rebuttal not be a true rebuttal?

15             MR. DUNN:  It is a true rebuttal, Your Honor.  It was

16   served timely, in accordance with the Court's scheduling order,

17   on October 8.  F.R.C.P. 26(2)(D) expressly allows a rebuttal

18   report in accordance with the Court's scheduling order, and it

19   systematically rebuts their proposed expert's written report.

20             Their proposed expert talks about lost profits,

21   Deque's lost profits.  The Kahaian rebuttal report rebuts that

22   very directly.  Their proposed expert report talks about

23   avoided development costs.  The Kahaian report directly rebuts

24   and contradicts the Benoit report in that regard as well.

25             What the rules do not say, Your Honor, is that a

34

1    rebuttal expert cannot testify that the methodology used by the

2    opposing party's expert is inaccurate or inappropriate or

3    otherwise lacking.  A rebuttal report rebuts what their person

4    says, and that's exactly what the Kahaian report says, and it

5    was served timely.

6             But a question that the Court asked right away is

7    spot on.  This all depends on what evidence comes in at the

8    trial.  So in our case-in-chief, as plaintiff, we will call --

9    we will call lay witnesses from Deque to articulate the facts

10   as we understand them and as we allege in this case.  Lay

11   witnesses on behalf of Deque will put in evidence as to how

12   Deque was damaged.  That evidence will already be in the record

13   from Deque's lay witnesses.

14            After we rest and directed verdict is denied, then

15   the defendants will attempt to put on their case-in-chief.  If

16   they call Benoit and Benoit -- or "Benoit," however it's

17   pronounced -- testifies as to what's in his report or testifies

18   about whatever it is that he wants to testify about, assuming

19   Judge Trenga allows it, then we could call Kahaian to rebut the

20   testimony that comes in from Benoit at that time.

21            And Judge Trenga, I trust, is a careful steward and a

22   good policeman of the Federal Rules of Evidence and the Federal

23   Rules of Civil Procedure and wouldn't want, for example, a

24   premature disguised motion in limine to prevent the plaintiff

25   from putting on any rebuttal evidence in this case, which is

1   all the Kahaian report does quite thoroughly, contradicting and

2   criticizing the proposed testimony as summarized in the Benoit

3   report.  That's all the Kahaian report seeks to do.

4           And so, of course, we would be allowed under the

5   federal rules to call a rebuttal witness, and as you pointed

6   out, of course correctly, it depends on the evidence that comes

7   in.  If the evidence comes in supporting our damages in our

8   case-in-chief and then, for example, Benoit seeks to contradict

9   that or offers some other testimony about what he believes our

10  damages are, then depending on what Benoit testifies to subject

11  to objections and rulings of the trial judge at that time, of

12  course, Kahaian in our rebuttal case would be allowed to come

13  up and say:  I'm Mick Kahaian.  I'm proposing to testify as an

14  expert under 702, and I heard Benoit, and I disagree with

15  Benoit for those reasons.

16          What would then happen, sir, as you well know,

17  defendants would object, Judge Trenga would hear the parties on

18  that, and then Judge Trenga would rule, but it all depends on

19  what comes in and what Judge Trenga feels is appropriate based

20  on the testimonies that he's -- the testimony that he heard,

21  the evidence that came in, the objections of the parties, his

22  rulings, and, of course, his substantial experience with these

23  matters, but it's premature in a vacuum, in a motion to strike

24  at this early stage, to say that the Kahaian report is out in

25  its entirety or that it should be excluded, which is what these

36

1    people at BrowserStack are overreaching to do right now

2    improperly.  So the motion should be denied, please.  Subject

3    to your questions, sir.

4              THE COURT:  Ms. Chang?

5              MS. CHANG:  If I may, I just want to address two

6    things.  I think the first is regarding the timing of when we

7    should decide this issue, is it an evidentiary issue, and I

8    think this is properly a pretrial issue.

9              I think there are definitely issues we will raise

10   later with in limine or even at trial as they come up that are

11   pure evidentiary issues, but this is at its fundamental core a

12   pretrial issue in the sense of the timing of disclosures that

13   were required, and this is very important with respect to when

14   the calculations in an initial disclosure was required and with

15   respect to when it, if you want to advance an expert opinion on

16   your affirmative damages case, when that is required, because

17   that affects everything else we did in the pretrial process,

18   what discovery took place, who we asked what kind of questions

19   at what time, who was deposed, who was deposed on what

20   discussions.

21             THE COURT:  But isn't it often the case -- and I take

22   your point, and I also appreciate the fact that all lawyers

23   want as much certainty going into the trial as possible, right?

24   You want to know what evidence is coming in, you want to know

25   what evidence is not coming in, and that certainty is good for

37

1    everybody, and I think every judge here strives to give the

2    parties that level of certainty as much as possible, but isn't

3    it often the case where you have an expert report -- I'm not

4    talking about the facts of this case at all --

5              MS. CHANG:  Okay.

6              THE COURT:  -- but you have an expert report, and

7    that expert report may be a little overbroad, right?

8              That expert report, you know, there could be, you

9    know, underlying evidentiary challenges to that expert report,

10   but you don't necessarily know until you get to trial and you

11   see exactly that the nature and the extent of the other

12   evidence before the trial judge can properly tailor the expert

13   testimony to the evidence.

14             So here -- and I certainly appreciate the concern

15   that this is an effort to get in through the back door what

16   can't be gotten in through the front door; I understand that;

17   and I also understand that at the end of the day, the

18   analysis -- and I don't mean to intrude on issues to be decided

19   by the trial judge, but this will be, I assume, be treated as a

20   rebuttal report and not as an affirmative report.

21             So at some point, the scope of plaintiff's expert,

22   the scope of their testimony will be tailored to properly rebut

23   within the rules whatever your expert says, and there are

24   certainly paragraphs in the report that jump out at the Court

25   as probably well beyond the scope of what would be properly

38

1   rebuttal, but I'm not sure I can say now with any degree of

2   certainty what this testimony at trial is going to be.  I can't

3   say with any degree of certainty what is going to constitute

4   proper rebuttal.

5          So tell me again how I can, I can make that

6   delineation now.

7          MS. CHANG:  I mean, I think you can make that

8   delineation --

9          THE COURT:  Which -- I'm sorry, go ahead.

10         MS. CHANG:  If you make that delineation now -- I

11  would say if it's an issue of are you able to, I think you can

12  make that decision now because I think you can see what is in

13  the Benoit report and what is in the Kahaian report and what is

14  in actual direct response or testimony contradicting what

15  Benoit says and what is, if we can just, you know, think about,

16  what is something that you can have imagined could have and

17  should have been brought in the August 9 report, right?

18         But what you're -- we're encountering a situation now

19  that allowing them to do this and just putting off a decision

20  of it late puts us in a situation where I agree with you the

21  normal course is we have a very broad initial disclosure about

22  damages and I as a defendant kind of need to address and defend

23  all of it, and it will all be filtered, and we'll decide what's

24  really at issue when it comes to trial.

25         The problem here is I as the defendant within the

1  discovery period was never given the opportunity to defend and

2  build a case to rebut some of this stuff.

3        THE COURT:  But the inadequacy of the initial

4  disclosure I don't believe is before me, is it?

5        MS. CHANG:  It was put forth as a secondary argument

6  for why the Kahaian report should be stricken.  There is case

7  law and we cite the *Jaguar Land Rover* case from this district

8  that -- that case was one where the damages expert actually

9  made the first -- the plaintiff's damages made the first

10  initial expert report, but that expert report scope went beyond

11  what was disclosed in the initial disclosure.  So that portion

12  of the report was stricken.

13        We have even kind of a more aggravated case,

14  egregious situation where it was not until the very end of

15  discovery where this is the first time we heard any disclosure

16  of any damages claim.

17        So this is not your normal situation where we have an

18  overbroad disclosure and I just have to deal with it and figure

19  out what happens at trial.  This is a situation where it's not

20  a moving target.  We never had a target.  There was no target

21  at all until October 8.

22        THE COURT:  When were the initial disclosures

23  provided?

24        MS. CHANG:  Beginning of June.  June 6 or something

25  around there, June 7.  And then it was amended September 6,

1    when they disclosed that -- Kahaian as an expert, but they

2    didn't amend the portion that requires computation of damages.

3            THE COURT:  All right.  Mr. Dunn, anything else?

4            MR. DUNN:  Your Honor, we disclosed damages theories

5    in the initial complaint, the amended complaint, the initial

6    disclosures, answers to first and second sets of

7    interrogatories, and during meets-and-confers with the

8    defendants.

9            To the point of counsel just moments ago, that she

10   would really like to conduct discovery as to Mr. Kahaian, I'm

11   more than willing and welcome them to contact me.  We'll

12   schedule a deposition.  Mr. Kahaian -- even though discovery is

13   closed and Mr. Kahaian was disclosed by us back on

14   September 6, they never asked to depose him at any time, never

15   issued any discovery about him at any time, I welcome their

16   discovery requests about Mr. Kahaian, and I invite them to

17   depose Mr. Kahaian anytime prior to trial.

18           THE COURT:  Do you want to depose him?  I mean, even

19   your request is assuming that there's some avenue for which he

20   could testify.

21           MS. CHANG:  Yeah.  I do not.  I want to respect the

22   close of discovery deadline, and that is why I think we wanted

23   to have this issue resolved now, because if he -- if this

24   report is allowed to go on, I don't have certainty as to what

25   the scope of that -- then I do need to.

41

```
 1          THE COURT:  Well, even if I deny your motion, it's
 2   not necessarily a finding that the report is allowed to come
 3   in.  It's just a -- it's just a finding that we don't know how
 4   much, if any, of the report is allowed to come in.
 5          MS. CHANG:  Absolutely, but --
 6          THE COURT:  The initial disclosure issue is an issue.
 7   I mean, it's, you know, there was the -- you know, the initial
 8   disclosures back in June were not specific.  They were not --
 9   and, you know, I mean, I've heard counsel on a number of
10   occasions tell me, you know, how their damages constitute
11   millions and millions of dollars, but I'm not sure why we can
12   come to that conclusion, but the, but the math that supports
13   it -- or the theories that support it, the specific evidence
14   that supports it was so late in coming.
15          MS. CHANG:  I think the issue is if, if we wait, if
16   there's no decision made as to whether certain portions of the
17   Kahaian report is proper or not, then we do nothing, and it's
18   at trial time and at in limine time and that decision then is
19   made that we're going to allow certain testimony that I believe
20   is objectionable or I believe that we hadn't had an opportunity
21   to allow our expert to address or to depose their expert on,
22   then we're definitely at a point in time where that's not
23   possible.
24          THE COURT:  Well, I think you have to assume then at
25   that point -- I mean, look, I take your point.  I mean, you're
```

42

1    concerned that the rebuttal report is going to come in really

2    as a, you know, as that you were deprived of the opportunity

3    for a rebuttal report, right, that it's really effectively

4    going to come in as their expert on damages, and so you were

5    deprived of the opportunity really to provide a rebuttal report

6    to that.

7         I understand that, and I understand that concern, and

8    I understand that that's a fair concern given sort of the clear

9    effort to circumvent the initial disclosure, which was not

10   made.  I understand that, but what I am entirely confident of

11   is the fact that the trial judge will see it as a true rebuttal

12   report, look at the scope of your expert, if you choose to put

13   one on.  If you don't put one on, there's nothing to rebut,

14   right?  Or if you don't -- you know, that's a -- again, that's

15   a trial tactical decision that you-all will have to make, but

16   the trial judge, you're going to have to trust, as I do, to

17   look at this and say, okay, what evidence would plaintiff's

18   witness properly be able to rebut and what would be the scope

19   of that testimony?

20        So there wouldn't necessarily be an opportunity for

21   you to rebut the rebuttal, right?  And I think that's kind of

22   the procedural posture.

23        I think Mr. Marton wants to yell at me a little bit.

24        MR. MARTON:  I'm itching because I have personal

25   experience with this case on this very issue.  So the day that

43

1    this report was served, October 8, was the day I took

2    Ms. Kumar's deposition, the CEO of Deque.  The vast majority of

3    Mr. Kahaian's affirmative opinion on lost profits and on

4    avoided development costs came from conversations he had with

5    Ms. Kumar as well as documents that were produced the day

6    before his report.

7            Discovery is closing three days later.  We have no

8    opportunity to explore the conversations that were had, no

9    opportunity to depose the witnesses on the assertions related

10   to these documents.  They're saying that it was $30 million

11   plus to --

12           THE COURT:  What if I give you seven days to depose

13   the expert and the CEO and -- on the limited issue of damages?

14           MR. MARTON:  The issue I have with that is we have

15   summary judgment coming up.  Discovery is closed.  It's going

16   to cost my client an additional $50,000.

17           It's just -- we -- I've been litigating this case

18   personally since day one and dealing with our client

19   personally.  Every time I deal with a client, I explain to

20   them, look, this is what you're facing, this is what the

21   plaintiff is claiming, this is the biggest exposure, because

22   the plaintiff says they're entitled to $50 million, whatever it

23   is.

24           This case was the first case in my 25-year career

25   where I could not explain to my client what they are facing

1   because there was no damages number disclosed, no computation,

2   nothing, until the day discovery was closed.

3            At the last settlement conference, they had a

4   different damages theory in that settlement conference, one I'd

5   never heard before, very creative one, one that I found

6   tremendous flaws in, this unreceived revenue that our client

7   had which somehow needed to be disgorged.  Surprising theory.

8            Well, it's not in the Kahaian report.  Now he has a

9   new theory.  They have two new theories I've never seen before

10  two days before close of discovery, and they want to start this

11  case over, and it's going to --

12           THE COURT:  We're not starting this case over, but I

13  take your point.

14           MR. MARTON:  It --

15           THE COURT:  And this is, you know, this -- there

16  was -- I'm not sure what plaintiff was doing for four months

17  with respect to prosecuting this case, right?  There was a long

18  time, and I'm not really sure what was happening.  I know what

19  should have been happening, but what wasn't happening, but what

20  I'm telling you is we are where we are.

21           The rebuttal report was filed timely.  It may be too

22  broad.  It may be that none of it is admissible.  It -- I am

23  inclined to forgive the disconnect between the initial

24  disclosures and the report itself, but I also don't want -- and

25  I understand the financial burden on your client, but I don't

1   want your client to be put at an unfair disadvantage.

2          So I do think I am inclined to, although I'm going to

3   think about it for a minute, I'm going to take a quick recess

4   and I'm going to think about it for a minute, but if I don't

5   strike portions of the report, I deny your motion, I am

6   willing to give you a brief extension to depose the CEO and the

7   expert.

8          MR. MARTON:  We would also need additional time to

9   draft an actual opposition report because they are putting

10  forth affirmative damages.

11         THE COURT:  It's still going to be -- it's still

12  going to be a rebuttal.  I think what you are assuming is the

13  trial judge doesn't treat it as a true rebuttal.

14         MR. MARTON:  We will -- we're comfortable with no

15  more discovery, nothing, case stays the way it is, and they can

16  have a rebuttal expert if it's limited to the paragraphs that

17  are true rebuttal, and they can't come forward and say lost

18  profits are $3 million and you saved --

19         THE COURT:  Even if I say it's true rebuttal now, you

20  know, wouldn't it be appropriate if I'm wrong given how the

21  trial unfolds for Judge Trenga to say, "You know what?  I'm

22  revisiting this"?

23         MR. MARTON:  I don't see how an affirmative damages

24  case could be true rebuttal in any context.

25         THE COURT:  I don't disagree with that.  I will tell

46

1    you I don't disagree with that, but I don't know.   I think

2    it's -- I think Mr. Dunn has a steep hill to climb, but I'm --

3    but I think until we know -- until we know what the evidentiary

4    boundaries are set by the trial judge, I don't know if he's --

5    I can't tell him today as a matter of law he can't try to climb

6    that hill.

7              MR. MARTON:  Your Honor, I, frankly, and with all due

8    respect, disagree.  I mean, the expert reports are meant to be

9    a boundary, the complete boundary of what an expert can say,

10   nothing beyond that.  Their disclosure, that limits what they

11   can say at trial.

12             So we know 100 percent the boundary of what our

13   expert, Mr. Benoit, can say at trial, and we also can tell that

14   Mr. Kahaian is exceeding that boundary with an affirmative

15   damages position, and if we can strike that --

16             THE COURT:  The rules permit that, though.  The rules

17   permit -- don't the rules permit --

18             MR. MARTON:  No.

19             THE COURT:  -- a rebuttal expert to present new

20   evidence as part and parcel of the rebuttal under Rule 26?

21             MR. DUNN:  Yes, Your Honor.

22             MR. MARTON:  No.  I mean, obviously, a rebuttal can

23   present new evidence, however, not a conclusion on a -- on an

24   issue that they carry the burden on for the very first time.

25             If this is allowed to go forward, we're flipping the

47

1    schedule of expert reports on the head, that --

2          THE COURT:  I get it, but -- we're flipping the

3    expert; I get it; but you're asking me to -- I mean, I think

4    we're kind of at this point going in circles.

5          MR. MARTON:  I think so.

6          THE COURT:  I understand your point.

7          Mr. Dunn, anything else?

8          MR. DUNN:  No, sir.  Thank you very much.

9          THE COURT:  All right.  All right, let me take about

10   five or ten minutes.  I just want to think about some of the

11   issues quickly, look at some of the notes I took, and then I'll

12   come back, and we'll rule on all three motions.

13         (Recess from 4:05 p.m., until 4:34 p.m.)

14        THE COURT:  With respect to plaintiff's motion docket

15   entry 71, the motion to compel production of documents, the

16   plaintiff points to three categories of documents:  story

17   points, research -- just a second, Mr. Dunn -- research -- you

18   defined it as story points, research solutions, and technical

19   specification documents; is that correct?

20        MR. DUNN:  Yes, sir.  We said plans, story points,

21   research engineering solutions --

22        THE COURT:  Engineering.

23        MR. DUNN:  Yes, Your Honor.  And technical

24   specification documents.

25        THE COURT:  Okay.

48

```
 1              MR. DUNN:  And also requested communications.

 2              THE COURT:  All right.  I'm going to grant

 3    plaintiff's motion to compel but only insofar as they pertain

 4    to the specific code allegedly misappropriated and not as to

 5    the entire toolkit.

 6              My understanding, Mr. Marton, is that his view is

 7    that those documents have already been provided as to the --

 8    those documents or those categories of documents have been

 9    provided as to the specific code.

10              MR. MARTON:  That is my understanding, but we can

11    confirm it.  These are a narrow set of documents.

12              THE COURT:  So what I will do is I'll put in the

13    order that I will ask you to confirm that and then provide a

14    certification to that effect within seven days.

15              MR. MARTON:  We can do that, Your Honor.

16              THE COURT:  Okay.

17              MR. MARTON:  Thank you.

18              THE COURT:  The second motion, docket entry 74, has

19    been withdrawn, so that will be denied as moot.  The third

20    motion, the motion to strike portions of plaintiff's expert's

21    rebuttal report, I share the defense's concern about the

22    timing, the procedure, and the backwards nature of the

23    disclosure, and one of the issues that I have a hard time

24    getting past is that in order for me -- what you're asking me

25    to do is fair and reasonable, which is essentially to set the
```

1    outer limits of what a rebuttal witness could testify to and

2    essentially find that regardless of what the testimony is at

3    trial, you know, these four-five paragraphs could certainly not

4    be admissible, and I understand that, and honestly, it's a

5    very, very close call, but I think before any judge, whether

6    it's me or whether it's Judge Trenga, can make a final decision

7    and can explain that decision on the record, I have a hard time

8    getting past there just has to be -- it has to be taken in

9    order.

10          In other words, as counsel has represented, the CEO

11   of plaintiff is likely to testify as a fact witness about

12   damages, or some other witness will testify as a fact witness

13   about damages.  The scope of that witness's testimony, whether

14   it's resolved by pretrial motion in limine, whether the issue

15   is whether or not the testimony is beyond the 26 -- Rule 26

16   disclosures, whether there is a nexus there, is, it seems to

17   me, a prerequisite to deciding anything beyond that.

18          The chain of -- the analysis must begin with what

19   evidence is admissible and then the defense evidence as to what

20   is properly admissible.  As we've discussed and I think is

21   clear, there are likely parts of -- significant parts of

22   plaintiff's expert disclosures that go well beyond what is

23   proper rebuttal, but until those other issues have been ruled

24   upon first, I can't sit here and say as a matter of law any

25   particular paragraph is so far out of bounds that as a matter

50

1    of law, it cannot possibly be admissible.

2            Again, I think the trial judge or if the issue is

3    referred to me, there are just going to have to be basic -- the

4    first evidentiary hurdle is going to have to be what is the

5    scope of proper fact witness testimony.  The next step is what

6    is the proper scope of your either fact lay witness or expert

7    witness with respect to damages.

8            And I think a ruling on those issues is necessary

9    before the Court can determine whether based on any rule

10   violation or just based on the rules of evidence, that portions

11   of the defense rebuttal notice can be excluded as a matter of

12   law.  I understand that puts defendants at a little bit of an

13   unsatisfying position, but I think when I consider how the

14   record is going to have to be made, I'm not sure we can start

15   at step 3.  I think it just has to evolve naturally, and the

16   Court is going to have to determine the proper -- and again,

17   I'm not -- whether this is pretrial in a motion in limine or

18   whether this is during trial, but I think the first two steps

19   have to be -- have to be completed before I can jump to

20   step 3.

21           So for that reason, I am going to deny the

22   defendants' motion to strike but to do so without prejudice to

23   raise these issues certainly in the context of perhaps another

24   motion in limine or motion to strike, but I think for today's

25   purposes, that's the best we can do.

51

1            MR. DUNN:  Thank you, Your Honor.

2            THE COURT:  All right.  Are there any other issues

3     that the parties would like to raise?

4            MR. MARTON:  With respect to taking discovery, which

5     is the basis of the plaintiff's damages expert report,

6     discovery is now closed.  I can think of at least two if not

7     potentially four depositions that will need to occur related to

8     the affirmative positions asserted.  To the extent we're going

9     to need to do *Dauberts*, where I need *Daubert* on this expert,

10    I'll need that testimony to understand the basis of his opinion

11    so we can challenge it.

12           THE COURT:  You're just going to have to file the

13    necessary motions.  I mean, it is not -- you know, we could

14    have wound up in this exact same spot, right?  I mean, if

15    they'd filed the motion -- I mean, just generally speaking, any

16    plaintiff outside of this case, they file an expert notice, the

17    defense files an expert notice, there's a rebuttal expert

18    notice, it may raise new issues, it doesn't necessarily mean

19    that all of a sudden -- all of a sudden, you know, we're into a

20    brand new set of discovery issues.

21           Rebuttal issues -- rebuttal notices, it's not

22    entirely unusual for them to raise new issues or new arguments.

23    Those are -- those issues, however, are resolved typically by

24    the trial judge in terms of what is really proper rebuttal.

25    There's no question that they are taking an enormously

52

1   aggressive position, a position that I suspect will not be

2   necessarily borne out, but I can't tell you today without

3   knowing what evidence is admissible where it is proper for me

4   to draw the line.

5          MR. MARTON:  To the extent we need to take

6   depositions, shall we file motions requesting the depositions?

7          THE COURT:  To the extent that you need to file

8   depositions, you should take -- you should file motions.

9          MR. MARTON:  Motions to take the depositions?

10          THE COURT:  Um-hum.

11          MR. MARTON:  Okay.  Thank you.

12          THE COURT:  All right.  Anything else?

13          MR. DUNN:  Thank you, Your Honor.

14          THE COURT:  All right.

15                       (Which were all the proceedings

16                        had at this time.)

17

18                    CERTIFICATE OF THE TRANSCRIBER

19       I certify that the foregoing is a correct transcript from

20   the official electronic sound recording of the proceedings in

21   the above-entitled matter.

22

23                       _____
                                    /s/
24                       Anneliese J. Thomson

25